

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORGES BANK,                         :

                 Plaintiff,     :

     -against-                      :

VIVENDI, S.A., JEAN-MARIE MESSIER    :
and GUILLAUME HANNEZO,               :

              Defendants.     :

---

No.

JURY TRIAL DEMANDED

---

## COMPLAINT

**GRANT & EISENHOFER P.A.**
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
Diane Zilka (DZ-9452)
Christine M. Mackintosh
485 Lexington Avenue
29th Floor
New York, NY 10017
Telephone:   (646) 722-8500
Facsimile:    (646) 722-8501

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ....................................................................2

II.  JURISDICTION AND VENUE .............................................................5

III. PARTIES ...............................................................................................11

IV.  MESSIER EMBARKS ON AN AGRRESSIVE PLAN TO TRANSFORM
     VIVENDI INTO AN INTERNATIONAL CONGLOMERATE, PUTTING IT IN
     A PERILOUS FINANCIAL CONDITION ............................................16

V.   DEFENDANTS' FRAUDULENT SCHEME ..........................................19

     A.    The Genesis Of Vivendi's Fraudulent Scheme...............................19

     B.    Vivendi Uses Improper Accounting To Shore Up Its Stock Prices..................20

           1.    Accounting Rules Applicable To Foreign Issuers Of Securities ...............20

           2.    Vivendi's Improper Balance Sheet Consolidations ....................................22

           3.    Vivendi's Improper Failure To Write Down Impaired Goodwill..............25

                 a.    Canal+ ..............................................................................26

                 b.    U.S. Filter ........................................................................31

           4.    Vivendi's Improper Recognition of Revenue On U.S. Filter ...................31

           5.    Vivendi's Improper Inflation Of Canal+'s Assets .....................................33

           6.    Vivendi's Improper EBITDA Manipulation...............................................34

           7.    Vivendi's Failure To Report Pro Forma Metrics Properly .......................37

           8.    Vivendi's Failure To Disclose Its 2% Indirect Interest  In Elektrim
                 Telekomunikacja........................................................................38

           9.    Vivendi Violated The Terms Of Its Own Publicly-Disclosed
                 Accounting Policies ...................................................................39

     C.    Vivendi Conceals A Growing Liquidity Crisis................................41

           1.    Vivendi Fails To Disclose It Inability To Generate  Expected Cash
                 Flows From Its Costly Acquisitions ..........................................42

           2.    Vivendi Fails To Disclose The Insufficiency Of Its Working
                 Capital ......................................................................................42

3.       Vivendi Fails To Disclose Acceleration Clauses In Its Loans...................43

4.       Vivendi Fails To Disclose Its Narrow Avoidance Of A December 2001 Credit Downgrade...........................................................................43

5.       Vivendi Fails To Disclose Material Commitments Concerning Cegetel and Maroc Telecom .......................................................44

        a.       The Cegetel Current Account ..........................................44

        b.       The Maroc Telecom Side Agreement.............................................46

VI.    Vivendi's False and Misleading Statements ......................................................47

VII.   The Truth Emerges, Causing Plaintiff To Incur Losses .....................................92

        €831 million.............................................................................................98

VIII.  DEFENDANTS' SCIENTER..............................................................................101

IX.    LOSS CAUSATION...........................................................................................107

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................110

XI.    PRESUMPTION OF RELIANCE.......................................................................111

XII.   TOLLING OF THE STATUTE OF LIMITATIONS.......................................112

XIII.  CLAIMS FOR RELIEF .....................................................................................113

FIRST CLAIM FOR RELIEF Violation of Section 10(b) of the Exchange Act and Subsections (a), (b) and (c) of Rule 10b-5 Promulgated Thereunder (Against All Defendants)...........................................................................................................113

SECOND CLAIM FOR RELIEF Violation of Section 18 of the Exchange Act (Against All Defendants)........................115

THIRD CLAIM FOR RELIEF Violation of Section 20(a) of the Exchange Act (Against Defendants Messier and Hannezo)..............................................................116

FOURTH CLAIM FOR RELIEF Violations of Section 11 of the Securities Act (Against All Defendants) .......................117

FIFTH CLAIM FOR RELIEF Violations of Section 12(a)(2) of the Securities Act (Against All Defendants) ..............119

SIXTH CLAIM FOR RELIEF Violations of Section 15 of the Securities Act (Against Messier and Hannezo)............120

SEVENTH CLAIM FOR RELIEF
        Common Law Fraud (Against All Defendants)................................................................123

EIGHTH CLAIM FOR RELIEF
        Common Law Negligent Misrepresentation (Against All Defendants) ..........................124

NINTH CLAIM FOR RELIEF
        Unjust Enrichment (Against All Defendants)................................................................126

XIV.    PRAYER FOR RELIEF ......................................................................................................126

XV.     JURY TRIAL DEMANDED ..............................................................................................128

1.    Norges Bank ("Plaintiff"), by its undersigned attorneys, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on its investigation (made by and through its attorneys), which investigation included, among other things, a review and analysis of (1) filings by Vivendi Universal, S.A. (now known as Vivendi, S.A. and referred to hereinafter as "Vivendi" or "the Company") with the Securities and Exchange Commission ("SEC") and the Commission des Operations des Bourse ("COB") (now part of the Autorité des marchés financiers), the French equivalent of the SEC; (2) press releases published by Vivendi; (3) analyst reports concerning Vivendi; (4) public statements by or on behalf of Vivendi and the other Defendants; (5) pleadings in litigation naming Vivendi as a defendant, including *In re Vivendi Universal, S.A. Securities Litigation*, No. 02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class Action") and *Securities and Exchange Commission v. Vivendi Universal, S.A., Jean-Marie Messier and Guillaume Hannezo*, Case No. 03-CIV-10195 (PKC) (S.D.N.Y.); (6) documents and information concerning the Defendants filed with or on record with criminal, civil and regulatory authorities in the United States and in France; and (7) newspaper and  magazine articles (and other media coverage) regarding Vivendi, its business, and/or the other Defendants. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

2.    Plaintiff brings this action against Vivendi, its former Chief Executive Officer and Chairman, Jean-Marie Messier ("Messier"), and its former Chief Financial Officer, Guillaume Hannezo ("Hannezo"). As a result of the fraud, inequitable acts and/or negligence alleged

1

herein, between October 30, 2000 and August 14, 2002 inclusive (the "Loss Period"), Plaintiff

suffered significant losses in connection with its purchases of Vivendi's ordinary shares that

traded on the EuroNext Paris, S.A. (the "Paris Bourse") and American Depository Shares

("ADSs") that traded on the New York Stock Exchange (the "NYSE").

## I.  NATURE OF THE ACTION

3.    This action involves the greed and hubris that led Messier, an ambitious former

investment banker, to attempt to transform a centuries-old French water utility company into an

international media and telecommunications conglomerate. Unfortunately for the Company's

shareholders, in pursuit of this transformation, Messier and his fellow Defendants created a

liquidity crisis for Vivendi and then proceeded to engage in a cover-up of that crisis using

improper accounting practices and materially false and misleading statements. Ultimately, after

Messier was forced out of Vivendi and the truth about Defendants' activities emerged, Vivendi's

securities lost over 80% of their market value.

4.    The entity now known as Vivendi was created over 150 years ago as a water

company. It maintained that focus until the late 1970's, when Messier's predecessor began

expanding and diversifying the Company. Messier, who was named to the Company's top office

in 1996, continued the expansion trend. He did so at a faster and more furious pace, with the

grand objective of building a multinational media conglomerate. During Messier's reign,

Vivendi spent tens of billions of dollars to acquire dozens of companies in the United States and

elsewhere.

5.    Messier's appetite for acquisitions caused the Company to incur massive debt. By

the time Messier was ousted, Vivendi carried the biggest debt load in French corporate history.

6.    In order to service the enormous debt created by this acquisition spree, Vivendi

needed to maintain the Company's favorable credit ratings and strong stock price - even in the

face of an economic downturn and faltering performance in the Company's core business sectors. To that end, Defendants tried to hide problems associated with Vivendi's acquisitions and investments by (a) fraudulently assuring investors that Vivendi had sufficient cash flow to manage its debts and (b) manipulating the Company's financial reports.

7.    During the Loss Period, and as a result of the acquisition spree, the Company's massive debt resulted in a cash flow crunch that (unknown to investors at the time) threatened to imperil the Company's very existence. As reported in The Wall Street Journal, during the Loss Period Vivendi in fact only narrowly avoided a credit downgrade, "which would have . . . plunged the company into a cash crisis." In response to this imminent peril, Hannezo wrote to Messier, "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat" and "All I ask is that all of this not end in shame." John Carreyrou and Martin Peers, *Damage Control: How Messier Kept Cash Crisis At Vivendi Hidden for Months — Media Giant Was At Risk Well Before Investors Knew,* The Wall Street Journal, Oct. 31, 2002, at A1.

8.    Despite the perilous cash flow situation facing the Company as a result of its acquisitions, Defendants issued rosy statements about Vivendi's financial health. As discussed in detail below, Defendants repeatedly represented that Vivendi was in the best of financial health and at one point during the Loss Period even represented that "pro forma net debt [was] practically non-existent." Defendants made other positive statements regarding Vivendi's robust financial position in presentations to market analysts, press releases, annual reports, filings with the SEC and in other public media.

9.    In addition to misleading the investing public about the Company's imminent liquidity crisis, Defendants improperly manipulated the Company's accounting in order to shore

- 3 -

up its financial reports. To that end, Defendants, among other things, (1) improperly consolidated into Vivendi's financial reports the results of companies in which Vivendi possessed less than 50% ownership, (2) improperly delayed the write down of impaired goodwill on acquisitions, (3) improperly recognized revenue, (4) improperly inflated assets, (5) improperly manipulated earnings and (6) violated its own accounting pronouncements. As set forth in detail below, the improper accounting rendered the Company's historical financial statements and balance sheets published during the Loss Period, as well as other public filings concerning Vivendi, materially false and misleading.

10. Having staved off the inevitable through manipulation and deception, eventually the weight of the lies collapsed Defendants' scheme. In June 2002, an immediate and severe cash shortage threatened the Company's continued viability. Over the course of the next several weeks, the truth about Defendants' deception was revealed.

11. On July 3, 2002, Vivendi's board ousted Messier. Thereafter, the Company's new management was forced to disclose that Vivendi would immediately have to secure both bridge and long-term financing to avoid default on its largest credit obligations. During a hearing before the French Parliament in September 2002, Vivendi's new chairman admitted that had Messier remained Vivendi's CEO beyond July 3, 2002, the Company undoubtedly would have gone bankrupt "within 10 days."

12. While Messier may have succeeded in transforming Vivendi into a multinational conglomerate, the Company—and ultimately its shareholders—would come to pay an unacceptably high price for Messier's unchecked ambition. Among other things, Defendants' actions resulted in (1) a crippling drop in the prices of Vivendi's common shares on the Paris

Bourse and its ADSs on the NYSE, (2) the Company's de-listing from the NYSE, (3) an onslaught of civil litigation and (4) the imposition of a massive civil fine by the SEC.

13.    The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of the Company's securities. The Company's ADSs lost 85% of their value from their Loss Period high of $75.50 and its common shares declined 83.9% from their Loss Period high of €86.50. These declines resulted in significant damage to the Company's shareholders, including Plaintiff.

## II.  JURISDICTION AND VENUE

14.    The claims herein arise under Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k; Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2); Section 15 of the Securities Act, 15 U.S.C. §77o; Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and common law.

15.    In connection with the acts and course of conduct alleged in this Complaint, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

16.    This Court has jurisdiction over this matter and over the Defendants pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. §§ 1331 and 1337(a); and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

17.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c) and (d). Offers and sales of Vivendi securities at issue in this action occurred in this District.

Plaintiff purchased ADSs in this District. In addition, many of the acts and practices made in furtherance of Defendants' fraudulent scheme and complained of herein occurred in substantial part and/or had an effect in this District, including the creation and implementation of the manipulative devices and contrivances. Further, Vivendi, Messier and Hannezo were located in, conduct (or conducted) substantial business in, and/or have (or had) substantial contacts with this District.

18.   Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over Plaintiff's claims because the Defendants' improper conduct had an impact upon the NYSE, the United States market on which Plaintiff purchased ADSs. Defendants' improper conduct, including that which was carried out in the United States, artificially inflated the price of the Company's securities and affected the integrity of the prices paid for Vivendi securities in the United States.

19.   This Court may also properly exercise subject matter jurisdiction under the "conduct test," articulated by the Second Circuit and other courts, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" the plaintiff's losses. The facts alleged herein show that the substantial activity in furtherance of Defendants' fraud that occurred within the United States was instrumental in causing Plaintiff's losses.

20.   In the United States, Vivendi sold securities whose prices were artificially inflated by means of false and misleading statements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and press releases. Vivendi actively

marketed and sold these securities in the United States despite its false reporting of its financial condition as alleged herein.  Many, if not most, of its press releases shared a New York dateline.

21.   Throughout the Loss Period, Vivendi regularly filed Forms 20-F and 6-K with the SEC that contained materially false and misleading information, as described in detail herein.

22.   Further, Vivendi organized meetings, including ones in New York, with the financial community, including with Wall Street analysts, to review reported financial results. As alleged herein, Defendants issued false statements at those meetings.

23.   Defendants also engaged in extensive activities in the United States to further their fraud and Vivendi's fraudulent scheme as alleged herein was centralized in large part in this District, where Messier and Hannezo orchestrated the fraud.  As described in detail herein, a primary objective of Vivendi's expansion plan during the late 1990s through July 2002 was to expand into the United States by acquiring businesses.  To do so, however, Vivendi had to go to the financial markets to raise the money needed for its acquisition strategy.  Vivendi used its securities – both ADSs and ordinary shares – and borrowed cash against future earnings to purchase substantial equity positions in a number of United States companies.  Defendants perpetrated their fraudulent scheme and course of conduct by using Vivendi's falsified financial statements to raise billions of dollars of new capital in the United States and elsewhere, while making false statements about Vivendi's financial condition and prospects in order to inflate the value of the shares it would use as consideration for its numerous acquisitions.  By these fraudulent means, Vivendi was able to acquire and conduct significant operations and activities in the United States.

24.   Vivendi was formed as a result of a 2000 merger among Vivendi, S.A.; Seagram Company Ltd. ("Seagram"), which owned United States company Universal Studios; and Canal

Plus, S.A. (the "Merger").  Before and throughout the Loss Period, Vivendi purchased such

United States companies as Aqua Alliance Inc.; EMusic.com; Houghton Mifflin Co.; MP3.com;

Prize Central Networks, Inc.; RMM Records & Video; Superior Services, Inc.; the StayWell

Company, Ltd.; Uproar, Inc.; U.S. Filter; and the entertainment assets of USA Network.

25.   According to a Vivendi press release dated February 16, 2001, the percentage of its

securities owned by United States shareholders had more than doubled over a 12-month period,

demonstrating that the Company was truly "international."

26.   During the Loss Period, Vivendi maintained offices in New York.  In September

2001, Messier and Hannezo moved to New York to obtain better direct corporate operations and

to more effectively promote misleading perceptions on Wall Street, as described in detail herein.

27.   On October 5, 2001, Vivendi further boosted its presence in the United States capital

markets when ADSs of Vivendi Environnement, Vivendi's environmental operations subsidiary,

began trading on the NYSE.  That day, Messier (who was also a member of the NYSE Board)

publicly explained the benefit of the listing:  "Today's listing gives Vivendi Environnement's

shares the visibility, credibility, and security that the prestigious New York Stock Exchange can

provide," describing New York as the "prestigious financial center."  Henri Proglio, Chairman of

Vivendi Environnement's Management Board, also stated that day that the NYSE listing

highlighted Vivendi Environnement's "large and expanding position in the U.S., [which was the

subsidiary's] second largest market, with nearly $6 billion in annualized sales" at that time.

Richard Grasso, the NYSE's then-Chairman and Chief Executive Officer, observed that the

NYSE listing provided Vivendi Environnement with a "gateway to the world's largest base of

investors."

28.   As news came to light at the end of the Loss Period of Vivendi's near-bankruptcy, the SEC commenced its investigation in this District. On or about September 24, 2003, the SEC obtained an Order from this Court requiring Vivendi to place $23 million into a judicial interest-bearing escrow account, representing the payment Vivendi might otherwise have been required to pay to Messier under a lucrative termination agreement he entered into with the Company just prior to his termination in early July 2002.  The SEC also obtained an Order from this Court preventing Messier from executing a judgment that he obtained from the New York State Supreme Court, New York County, confirming a $23 million arbitration award to Messier on his claim for compensation under his termination agreement with Vivendi.

29.   In addition, the SEC brought enforcement proceedings against Vivendi, Messier and Hannezo in this District for violations of United States securities laws, alleging substantial fraudulent conduct in the United States, including the issuance of false statements to investors in the United States.  The SEC asserted that certain of the acts and practices described in its enforcement proceedings that constituted violations of the Securities Act and the Exchange Act occurred within this District.  In further support of its complaint against Defendants, the SEC alleged that the Court had subject matter jurisdiction over the claims because during the relevant time period Vivendi conducted business and maintained offices in this District, and that during the relevant time period, Messier and Hannezo resided in the District.  As part of the resolution of the SEC's enforcement action, Defendants executed a Consent Decree entered in this Court.

30.   In April 2004, the SEC issued a cease-and-desist order against John Luczycki, Vivendi's former Chief Accounting Officer and controller, who resided in New York, finding that during the period December 2000 to July 2002, he had violated United States anti-fraud statutes.

- 9 -

31.  The United States Attorney's Office for the Southern District of New York also conducted a criminal investigation of Defendants' fraudulent conduct in this District.

32.  Subject matter jurisdiction is further supported by the manner in which the same scheme and conduct affected the markets in the United States and overseas. There was but a single market for Vivendi securities. Vivendi securities were priced based on trades reported on the NYSE and the Paris Bourse, both of which are highly integrated. That worldwide market was defrauded by Defendants' conduct, causing extensive effects on the domestic and foreign securities market for Vivendi securities. When the investment community first learned the extent of Vivendi's severely weakened financial condition on July 2, 2002, the price of ADSs on the NYSE and ordinary shares on the Paris Bourse significantly declined in tandem. Again, on August 14, 2002, when Vivendi admitted it was facing a severe liquidity crisis, the price of Vivendi's ordinary shares and ADSs both plunged precipitously by similar percentages.

33.  The Court in the Securities Class Action has already exercised subject matter jurisdiction over federal securities claims substantially identical to those brought by Plaintiff here. In its opinion denying Defendants' motions to dismiss (*In re Vivendi Universal S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) (the "Court's Opinion")), the Court took note that Defendants did not dispute that Messier and Hannezo moved to the United States in September 2001, that Vivendi filed Forms 20-F and 6-K with the SEC, that Defendants disseminated other materials to investors in the United States, and that Vivendi made numerous acquisitions in the United States. The Court further held that the Securities Class Action complaint sufficiently alleged grounds for the Court to exercise subject matter jurisdiction over the claims of foreign investors against Defendants including that:

(a)  Vivendi had undertaken a scheme to acquire numerous well-known U.S. entertainment and publishing companies, such as Universal Studios,

- 10 -

> Houghton Mifflin and USA Networks, and to successfully accomplish this plan, it took on a $21 billion debt while allegedly fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debt;
>
> (b)    Messier and Hannezo were alleged principal actors in this scheme; and
>
> (c)    they spent half of their time in the United States from the middle through the end of the Loss Period specifically to increase investments by United States investors in Vivendi.

34.    The Court found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the Loss Period, allegedly to better direct corporate operations and to more effectively promote misleading perceptions on Wall Street, that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of the foreign investors' decisions to purchase Vivendi's stock abroad. *Id.* at 70.

35.    In its Order denying reconsideration of the Court's Opinion in the Securities Class Action (*In re Vivendi Universal S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004)), the Court reconfirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because allegedly false statements emanated from the United States; Messier and Hannezo, Vivendi's two highest officers, moved to and operated Vivendi from the United Sates allegedly to better implement a fraudulent scheme; and Messier and Hannezo carried out significant acts in the United States in furtherance of the alleged fraud and as alleged controlling officers of Vivendi.

## III.  PARTIES

36.    Plaintiff Norges Bank is the central bank of Norway and maintains its office and principal place of business in Oslo, Norway.  It is a separate legal entity wholly owned by the state of Norway.  Through Norges Bank Investment Management, its investment arm, Plaintiff is responsible for investing the international assets of the Norwegian Government Pension Fund-

Global (formerly known as the Government Petroleum Fund) on behalf of Norway's Ministry of Finance. This portfolio holds the long-term financial savings of the state of Norway and currently has assets of approximately $328 billion. Norges Bank Investment Management also manages the Bank's own Foreign Exchange Reserves, with current assets of approximately $38 billion. Norges Bank is the counterparty for all transactions and the registered owner of all financial assets in both these portfolios. Norges Bank invests the portfolios in international equities and fixed income instruments, money market instruments and derivatives. Norges Bank acquired over 200,000 Vivendi ADSs as a result of the Merger and purchased additional Vivendi ADSs during the remainder of the Loss Period. Norges Bank also acquired over 1,000,000 Vivendi ordinary shares as a result of the Merger and purchased additional Vivendi ordinary shares during the Loss Period.

37. Defendant Vivendi is a société anonyme organized under the laws of France with its principal place of business at 42, avenue de Friedland, 75008 Paris, France. Vivendi has offices in New York located at 800 Third Avenue, New York, NY 10022. Between October 30, 2000 and April 20, 2006, Vivendi was known as Vivendi Universal, S.A.

38. At all times relevant to this Complaint, Defendant Vivendi described itself as a global conglomerate engaged in business focused primarily on two core areas: "Media & Communications" and "Environmental Services." Vivendi's Media & Communications business was divided into five segments: (a) Music, (b) Publishing, (c) TV and Film, (d) Telecom, and (e) Internet. Defendant Vivendi is the entity created by the Merger and is named as a defendant herein in its own right and as the successor entity and successor-in-interest to Vivendi, S.A.; Seagrams; and Canal Plus, S.A. (Canal +). At all times relevant to this Complaint, Vivendi sold ADSs on the NYSE and common shares on the Paris Bourse.

- 12 -

39. Defendant Messier was, during the times relevant to this Complaint, Vivendi's Chief Executive Officer and Chairman of the Company's Board until his forced resignation on July 3, 2002. He was a "control person" of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites (including use of a $17 million apartment the Company acquired for him in New York).

40. Defendant Hannezo was, during the times relevant to this Complaint, Chief Financial Officer of Vivendi until his resignation on July 9, 2002. Hannezo was, according to the Associated Press, a "close collaborator" of Messier. He was a "control person" within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

41. Both Messier and Hannezo, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the relevant period. Messier and Hannezo both directly participated in the management of the Company; were directly involved in the day-to-day operations of the Company at the highest levels; and were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein. Both Messier and Hannezo were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein; were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company; and approved or ratified these statements in violation of the federal securities laws.

42.   Because of their Board memberships and/or executive and managerial positions with Vivendi, both Messier and Hannezo had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

43.   The statements made by Messier and Hannezo, as particularized below, were materially false and misleading when made.  The true financial and operating condition of the Company, which was known or recklessly disregarded by Messier and Hannezo, remained concealed from the investing public throughout the Loss Period.  Both Messier and Hannezo, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein.  As officers and directors, and control persons, of a publicly-held company whose ADSs were, at all times during the Loss Period, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Messier and Hannezo both had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  Messier's and Hannezo's misrepresentations and omissions during the Loss Period violated these specific requirements and obligations.

44.  Both Messier and Hannezo, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Loss Period.  Messier and Hannezo both were provided with copies of the documents alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, both Messier and Hannezo knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations concerning the Company complained of herein were then materially false and misleading.  Accordingly, both Messier and Hannezo are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

45.  Both Messier and Hannezo are liable as direct participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Vivendi ADSs and ordinary shares during the Loss Period by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme (i) deceived the investing public regarding Vivendi's business, operations, management and the intrinsic value of Vivendi ADSs and ordinary shares; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain credit ratings so that it could accumulate more and more debt to make acquisitions on terms favorable to Vivendi; and (iv) caused Plaintiff to purchase or otherwise acquire Vivendi ADSs and ordinary shares at artificially inflated prices.

### IV. MESSIER EMBARKS ON AN AGRRESSIVE PLAN TO TRANSFORM VIVENDI INTO AN INTERNATIONAL CONGLOMERATE, PUTTING IT IN A PERILOUS FINANCIAL CONDITION

46.   The company now known as Vivendi began its existence in 1853 as a water outfit named Compagnie Générale des Eaux ("CGE"). For more than a century, CGE remained largely focused on the water sector. However, following the appointment of Guy Dejouany as CEO in 1976, CGE extended its activities into other sectors with a series of takeovers. Beginning in 1980, CGE began diversifying its operations from water into waste management, energy, transport services, and construction and property.

47.   The drive to push CGE beyond its humble beginnings intensified with Messier's 1996 appointment as Dejouany's successor. Under Messier's stewardship, CGE changed its name to Vivendi S.A. and rapidly embarked on a multi-billion dollar acquisition spree with an eye toward transforming itself into a multinational media conglomerate. Messier spent more than $75 billion in pursuit of this dream, causing Vivendi to acquire significant stakes in a wide variety of companies. For example, Messier spearheaded the following deals between 1997 and 1999:

- The €5.8 billion acquisition of U.S. Filter, "a U.S. group which is the leading global treatment manufacturer of water equipment and systems;"

- The €103.5 million acquisition of Waste Management, Inc.;

- The €932.2 million acquisition of Superior Services following a successful takeover bid;

- The acquisition of a 51% interest in Monaco Télécom;

- A €1.198 billion investment in a joint venture with Elektrim Telekomunikacja that gave the Company a 49% interest in a company that controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan;

- The acquisition of Havas S.A., which in turn acquired Cendant Software, "the world's second leading developer of educational and games computer software," for €678 million; Anaya, a "Spanish publishing firm," for €199.7 million; and MediMedia, "a company specializing in the publication of medical information," for €237 million;

- The acquisition—through its Cegetel subsidiary—of a 49.9% ownership interest in Telecom Developments through investments totaling €518.2 million;

- The €1.25 billion acquisition of a 24.4% interest in British Sky Broadcasting Plc ("BSkyB"), the "leading pay-television company in the United Kingdom and Ireland;" and

- The €794.2 million acquisition of a 49% interest in the holding company that owns 56.5% of Fomento De Construcciones y Contratas ("FCC").

48.  By December 2000, Messier had significantly expanded and diversified the Company's holdings, positioning Vivendi to take its place among the world's largest media and communications conglomerates.  Not satisfied with the massive acquisitions to date, Messier embarked on his most aggressive acquisition yet—the €29.5 billion three-way Merger among the original Vivendi S.A., Seagram and Canal Plus S.A. ("Canal+").[1]  The Merger closed on December 8, 2000.  As the Company proudly announced in its 2000 Annual Report:

> As a result of the Merger Transactions, we are one of the world's leading media and communications companies, with assets that include the world's largest recorded music company, one of the largest motion picture studios and film libraries in the world and leading businesses in the global telecommunications, television, theme park, publishing and Internet industries.  We believe that we will become a fully integrated global media and communications company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

---

[1]    The Company is the surviving entity of the Merger.

49.  According to press reports, the Merger had "transformed the Company into the second-largest global media empire after AOL Time Warner." *Vivendi Provides Critics Some Revenue Numbers To Chew On*, The New York Times, Feb. 12, 2002, at W1.

50.  Messier continued the acquisition binge before the ink on the Merger Agreement even had time to dry.  Mere days after the Merger's completion, Messier announced yet another costly acquisition—the $2.2 billion purchase of Maroc Telecom, giving Vivendi a 35% stake in Morocco's telephone monopoly.  The Maroc Telecom acquisition sparked another wave of costly purchases as Messier continued throughout 2001 to gobble up company after company.  Notably, Vivendi engaged in the following transactions in 2001:

- The $128 million February 2001 acquisition of Uproar, Inc.;

- The $24 million June 2001 acquisition of EMusic.com;

- The $2.7 billion July 2001 acquisition of Houghton Mifflin; and

- The $400 million August 2001 acquisition of MP3.com.

51.  In addition to the costly purchases described above, Messier attempted to acquire luxury-goods mogul Bernard Arnault's internet holding company, Europ@web, for $700 million in March 2001.  The acquisition-craved Messier also held secret talks during 2001 to make a multi-billion dollar investment in either AT&T Corporation or Comcast Corporation.  Undeterred when these discussions failed to come to fruition, Messier simply moved on to a different target, meeting with the CEO of General Electric—NBC's parent company—at least twice during the fall and early winter of 2001 to see if he could get a deal going with the network.  Unfortunately for Messier, GE was not interested.

52.  Vivendi's acquisition spree continued into 2002.  In May of that year, Vivendi acquired the entertainment assets of InterActiveCorp—formerly known as USA Networks,

- 18 -

Inc.—for a whopping €11 billion. In addition to $1.62 billion in cash, Vivendi gave InterActive $2.5 billion worth of shares of Vivendi subsidiary Vivendi Universal Entertainment LLLP ("VUE"), $1.75 billion of which were encumbered by put/call options under which InterActive could force VUE to buy back the shares.

53.    Messier's acquisition binge, which cost Vivendi more than $75 billion, caused the Company's debt to skyrocket. Specifically, Vivendi financed the €5.8 billion March 1999 U.S. Filter acquisition through a €1.7 billion convertible bond offering, which accounted for the lion's share of the €3 billion debt Vivendi was carrying at the time of the December 2000 Merger. Within eighteen months of the Merger, Messier's aggressive acquisition tactics would cause this figure to increase exponentially—to a staggering $21 billion. By the end of Messier's reign, he had achieved the dubious distinction of leading Vivendi to the biggest debt load in French corporate history.

## V.  DEFENDANTS' FRAUDULENT SCHEME

### A.  The Genesis Of Vivendi's Fraudulent Scheme

54.    Messier's ambitious acquisition program severely threatened the Company's liquidity. In addition to depleting the Company's cash reserves, Vivendi had used its own stock to finance Messier's acquisitions and borrowed against its future earnings to make up the shortfall. To keep the spree going, Messier knew that he had to keep the Company's share prices and credit ratings as high as possible. Unwilling to risk losing the empire he had worked so hard to create, Messier—with the direct involvement of CFO Hannezo—perpetrated a massive accounting fraud to pump up the Company's financial statements and falsely portrayed the Company's true liquidity and cash flow positions, thereby allowing the Company fraudulently to inflate its stock prices to ensure its continued access to additional financing.

### B. Vivendi Uses Improper Accounting To Shore Up Its Stock Prices

55.   Vivendi employed various types of improper accounting, which had the purpose and effect of materially misstating the Company's financial results during the Loss Period.

### 1.    Accounting Rules Applicable To Foreign Issuers Of Securities

56.   Foreign issuers of securities that are required to file annual reports with the SEC must report the financial results of their operations in accordance with Generally Accepted Accounting Principles ("GAAP") applicable in the United States, their home country, or some other jurisdiction.  Item 17 of the Instructions to Form 20-F—on which foreign issuers file their Annual Reports—requires that foreign issuers' "financial statements shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles."

57.   During the Loss Period, Vivendi filed annual consolidated financial statements with the SEC on Form 20-F and made additional disclosures on Form 6-K.  While Vivendi's 1999, 2000 and 2001 annual reports represented that the Company's financial statements were prepared in accordance with French GAAP, these financial statements purportedly were reconciled to U.S. GAAP.  Further, the Company's 2001 Form 20-F—which was signed by Hannezo—represented that the Company's financial information would be communicated on a "U.S. GAAP basis" beginning in 2002 and then reconciled to French GAAP.  Despite these representations, Vivendi deviated from U.S. GAAP in several material respects in reporting the results of its operations.

58.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").  With the SEC's permission (Accounting Series Release 150), the AICPA established its GAAP

principles through three successor groups:  the Committee on Accounting Procedure; the

Accounting Principles Board (the "APB"); and the Financial Accounting Standards Board (the

"FASB").

59.    The financial statements that were issued by Vivendi for the years 1999, 2000 and

2001 did not fairly and accurately represent the Company's financial position and operations

because they violated the following principles of GAAP:

- That financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts ("CON") No. 1, ¶ 34);

- That financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

- That financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

- That financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

- That information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (CON No. 2, ¶¶ 79,80);

- That conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (CON No. 2, ¶¶ 95, 97);

- That revenues and gains generally should not be recognized until realized or realizable, and that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (CON No. 5, ¶ 83); and

- That the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, ¶ 145). . .

60.  More specifically, Vivendi's financial statements for at least the years 1999, 2000 and 2001 were materially false and misleading because Messier and Hannezo manipulated the Company's reported financial results through a host of accounting practices that directly violated specific GAAP provisions as discussed below.

## 2.    Vivendi's Improper Balance Sheet Consolidations

61.  GAAP permits the consolidation of related entities onto a company's balance sheets. Accounting Research Bulletin ("ARB") No. 51 of U.S. GAAP provides:

> The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions.  There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

62.  U.S. GAAP, however, limits the circumstances under which such consolidation is proper.  In general, majority control is a prerequisite for consolidation.  ARB No. 51, as amended by FASB's SFAS No. 94, provides:

> *The usual condition for a controlling financial interest is ownership of a majority voting interest*, and, therefore, as a general rule *ownership by one company, directly or indirectly, of over fifty percent of the outstanding voting shares* of another company is a condition pointing toward consolidation.

(emphasis added).  While majority control is typically required for consolidation, the Emerging Issues Task Force ("EITF")'s Abstract No. 96-16 permits minority shareholders possessing certain rights to overcome the presumption that consolidation requires a majority voting interest in certain limited circumstances.  Specifically:

- 22 -

> The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:
>
> 1.      Selecting, terminating, *and* setting the compensation of management responsible for implementing the investee's policies and procedures; [and]
>
> 2.      Establishing operating *and* capital decisions of the investee, including budgets, in the ordinary course of business.

EITF No. 96-16. While the Task Force noted that the above examples were merely illustrative and not necessarily all-inclusive, U.S. GAAP clearly limits the circumstances under which consolidation of entities in which a company owns less than 50% interest is permitted.

    63.   In fact, APB 18, *The Equity Method of Accounting for Investments in Common Stock*, provides special rules for accounting for an entity of which a company owns between 20-50% and over which the company has the ability to exercise significant influence. Specifically, APB 18 provides:

> In order to achieve a reasonable degree of uniformity in application, the Board concludes that an investment (direct or indirect) of 20% or more of the voting stock of an investee should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over an investee. *Under the equity method, an investor recognizes its share of the earnings or losses of an investee in the periods for which they are reported by the investee in its financial statements.* An investor's share of earnings or losses from its investment is ordinarily shown in its income statement as a single amount. The Board recognizes that determining the ability of an investor to exercise such influence is not always clear and applying judgment is necessary to assess the status of each investment.

APB 18 (emphasis added).

    64.   Beginning at least with its 1999 financial statements through July 2002, Vivendi violated U.S. GAAP—to which it claimed, in its filings with the SEC, that its financial results

were reconciled—by consolidating into its financial statements the results of certain entities in which the Company possessed less than 50% ownership and over which it possessed insufficient control to permit such consolidation. Specifically, Vivendi consolidated the results of French telecommunications company Cegetel—in which it held only a 44% interest—into its own results for 1999, 2000 and 2001 and the results of Maroc Telecom—in which it held only a 35% interest—into its own results for 2001. Vivendi—as the owner of between 20% and 50% of Cegetel and Maroc Telecom—should have accounted for these entities using the equity method of accounting, rather than consolidating their financial results into its own.

65.    In addition, Vivendi violated SFAS 95, *Statement of Cash Flows*, by improperly consolidating entities whose cash it could not access. Specifically, Paragraph 15 of SFAS 95 provides:

> The information provided in a statement of cash flows . . .  should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing . . .

Vivendi's disclosures concerning its cash flows—rather than helping investors to assess it ability to generate positive future cash flows and its ability to meet its obligations—painted a materially false picture of the Company's finances by including cash that it had no right to access on its balance sheets.

66.    These improper consolidations caused Vivendi to misstate materially its financial results. Specifically, the improper consolidation of Cegetel's results with the Company's caused Vivendi to overstate its reported revenues by €3.9 billion, €5.1 billion and €6.4 billion for the years ended 1999, 2000 and 2001, respectively, while Vivendi's reported revenues were overstated in 2001 by an additional €1.4 billion as a result of the improper consolidation of Maroc Telecom, bringing its total overstatement for the year to €7.8 billion. Further, the

- 24 -

improper consolidation of Cegetel and Maroc Telecom caused Vivendi to overstate its operating

income; earnings before interest, taxes, depreciation and amortization ("EBITDA"); cash flow

provided by operating activities; and reported growth rates during these years.

67.    The improper consolidation of Cegetel and Maroc Telecom was a key component of

Defendants' fraudulent scheme because it created the false impression that the Company had

much higher revenue and income than it actually did.  These falsified financial results, in turn,

ensured that the Company's share prices and credit ratings remained artificially high.  Further, by

creating the false impression that the Company could readily access these entities' cash to use for

its own purposes, the improper consolidation of Cegetel and Maroc Telecom helped Defendants

to conceal Vivendi's burgeoning liquidity crisis.  Tellingly, following Messier's ouster, Vivendi

admitted that it had no right to access the cash flows of Cegetel and Maroc Telecom.  Notably,

newly-appointed CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that

Vivendi did "not have access to Cegetel and Maroc Telecom."  Similarly, Fourtou conceded

during an August 14, 2002 conference call with investors that "Vivendi cannot access the cash

flow generated by the Companies it owns less than 50% of"—which would have included

Cegetel and Maroc Telecom.

### 3.    Vivendi's Improper Failure To Write Down Impaired Goodwill

68.    "Goodwill" is an accounting term used to reflect the portion of the market value of a

business entity that is not directly attributable to its assets and liabilities.  When one company

purchases another for more than its book value—*i.e.*, the amount of its assets minus its

liabilities—it is required to record goodwill as an asset in its financial statements and to present it

as a separate line item on its balance sheet.

69.  U.S. GAAP's Accounting Principles Board ("APB") Opinion No. 16, *Business*

*Combinations*, sets the amount of goodwill to be recorded as follows:

> The acquiring corporation records at its cost the acquired assets less
> liabilities assumed.  A difference between the cost of an acquired
> company and the sum of the fair values of tangible and identifiable
> intangible assets less liabilities is recorded as goodwill.

ABP No. 16, ¶11.  While the "cost of an acquired company" is easily determined in a cash

acquisition, this determination is complicated somewhat in an acquisition financed through stock.

Paragraphs 74-75 of APB No. 16 set forth the requirements for valuing stock used to effect an

acquisition for purposes of determining the "cost of the acquired company" as follows:

> The fair value of securities traded in the market is normally more
> clearly evident than the fair value an acquired company.  Thus, the
> quoted market price of an equity security issued to effect a business
> combination may usually be used to approximate the value of an
> acquired company.
>
> If the quoted market price is not the fair value of the stock . . . , the
> consideration received should be estimated even though measuring
> directly the fair values of the assets received is difficult.

Vivendi violated U.S. GAAP by failing timely to write down impaired goodwill on its Canal+

and U.S. Filter acquisitions.

### a.    Canal+

70.  In connection with the Merger, Vivendi recorded goodwill of €12.544 billion for

Canal + — more than the €12.537 amount at which it valued the cost of Canal+.

71.  In the fourth quarter of 2001, Vivendi recorded a €6.0 billion charge for an

impairment in the value of Canal+'s goodwill under French GAAP.  This was followed by an

additional €3.8 billion charge under French GAAP for an impairment in the value of Canal+'s

goodwill during the quarter ended June 30, 2002.  Accordingly, by June 2002, Vivendi had

written off €9.8 billion, or approximately 78%, of the total €12.537 billion cost to acquire

Canal+, under French GAAP.

72.   While Vivendi had written off €6 billion in goodwill attributable to the Canal+

acquisition by the end of 2001, Vivendi did not recognize *any* impairment to goodwill under U.S.

GAAP until the first quarter of 2002.   The Company purported to explain this disparate

accounting treatment in its 2001 financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-Lived Assets*
>
> As required under both French and U.S. GAAP [see SFAS No. 121], Vivendi Universal reviews the carrying value of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable.   Under French GAAP, measurement of any impairment is based on fair value.   In 2001, following the recent market decline, particularly in the Internet, media and telecommunications industries, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest).   Under U.S. GAAP, measurement of any impairment is based on the provisions of Statement of Financial Accounting Standards (SFAS) No.   121, Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of (SFAS 121). *SFAS 121 requires that an impairment loss be recognized whenever the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset are less than the net carrying value of the asset.   On this basis no impairment was indicated and accordingly the goodwill impairment charge was reversed.*

(emphasis added).

73. SFAS 142, *Goodwill and Other Intangible Assets*, requires intangible assets, such as

goodwill, to be reviewed for impairment in accordance with SFAS 121, *Accounting For The*

*Impairment Of Long-Lived Assets And For Long-Lived Assets To Be Disposed Of.*   SFAS 121

provides that an impairment loss shall be recognized if the carrying amount of an intangible asset

is not recoverable and if its carrying amount exceeds its fair value. Specifically, SFAS 121 provides:

> 1.    An entity shall review long-lived assets and certain identifiable intangibles and goodwill related to those assets to be held and used for impairment *whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable*. The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:
>
> a.    A significant decrease in the market value of an asset
>
> b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset
>
> c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator
>
> d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset
>
> e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that *demonstrates* continuing losses associated with an asset used for the purpose of producing revenue.

SFAS 121 (emphasis added). SFAS 121 expressly requires a goodwill impairment to be recognized if the future cash flows expected to be generated by an asset are less than the carrying amount of an asset. Accordingly, by not taking any write-offs for impaired goodwill under U.S. GAAP in 2000 or 2001, Vivendi essentially represented to investors that the cash flows Vivendi expected to receive from Canal+ equaled or exceeded its carrying value. As set forth below, however, Defendants knew—or recklessly ignored—that Vivendi did not expect to receive cash flows from Canal+ equal to its carrying value long before it recognized goodwill impairments. Accordingly, Defendants violated SFAS 121 by failing to write down impaired goodwill for Canal+ before the first quarter of 2002.

- 28 -

74. As Defendants knew long before the first quarter of 2002, the value of Canal+'s

"smart cards" had been severely compromised by known piracy no later than March 1999.

Notably, Canal+ filed suit against NDS Group PLC ("NDS") in March 2002 in the United States

District Court for the Northern District of California, alleging that NDS had, since March 1999,

permitted and facilitated the proliferation of counterfeit smart cards that enabled users to

circumvent the security measures built into the Canal+ conditional access system, causing

Canal+ to suffer losses over a billion dollars. According to Canal+'s Amended Complaint (filed

on August 21, 2002),

> C+ Technologies designs and sells systems used by pay television
> operators around the world to control access to their copyrighted and
> proprietary broadcast signals. The safety of those signals depends
> upon the security schemes adopted and implemented by Canal+.
> Digital television providers and content providers fear the
> unauthorized interception of the digital television signal because it
> deprives them of revenue, increases the costs to paying customers and
> may permit the unauthorized digital copying of copyrighted works for
> illegal distribution. Canal+ has implemented some of the strongest
> security measures that exist today in its smart cards used to control
> access to digital television signals . . .
>
> *Canal+'s security measures were more than adequate until March
> 1999 when its smart card software code was copied and published on
> a web site called "DR7.com."* After the publication of that code,
> counterfeit Canal+ smart cards began to appear on the market . . .
> The ability to circumvent these technological security measures
> spawned a proliferation of the supply of counterfeit Canal+ smart
> cards and the existence of these cards has caused great damage to
> Canal+ and the system operators who depend on its services.

*Groupe Canal+ S.A. v. NDS Group PLC,* C02-01178 (N.D. Cal. March 11, 2002) (Amended

Compl. ¶¶ 2-3) (emphasis added). Canal+ estimated that NDS's "illegal conduct ha[d] caused it

harm in excess of $1,000,000,000." Amended Compl. ¶ 1.

75. Further, Canal+ expressly alleged that this piracy had damaged the Company's

revenues. Specifically, Canal+ alleged:

> The mass production of counterfeit C+ Technologies smart cards has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA . . . As a result of the counterfeiting, Canal+ has lost sales opportunities and has lost customers to its competitors . . . The widespread use of [counterfeit smart cards] has caused Group Canal+ and pay television operators from the Canal+ group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.

Amended Compl. ¶¶ 28-30. Plainly, Canal+'s cash flow had been negatively impacted by the piracy.

76.    By failing to write down Canal+'s goodwill under U.S. GAAP until the first quarter of 2002, Defendants misrepresented that this known piracy had no effect on the company's value and anticipated cash flow when this plainly was false. Accordingly, Defendants violated SFAS 121 by continuing to represent publicly that Canal+ was as valuable after this piracy, which Canal+ itself estimated to cause harm in excess of $1 billion, as it was before this theft.

77.    Moreover, in March 2001 Defendants announced a goodwill write-down under U.S. GAAP. Defendants hid their own wrongdoing in failing to take this write-down sooner by attributing it to the adoption of a new accounting standard—SFAS 142—that changed the practice for goodwill accounting.[2] By hiding behind the adoption of a new accounting standard, Defendants concealed their improper failure to write down Canal+'s goodwill when the piracy that threatened the value of the company was discovered in March 1999 as required under SFAS 121.

_____

[2]    Prior to the June 2001 adoption of SFAS 142, companies were permitted to amortize goodwill over a period not to exceed forty years. SFAS 142 prohibited the amortization of goodwill and required companies to carry goodwill on their balance sheets as an asset.

78.  Tellingly, following Messier's and Hannezo's ouster, the Company recorded an additional €3.8 billion impairment in the value Canal+'s goodwill at the end of the first half of 2002 under French GAAP—even though Canal+ had reported revenue growth of 8% during this period.  The fact that Vivendi's new management took additional write-offs of Canal+'s goodwill during a period when its business was actually improving further evidences that the impairment should have been taken earlier.

      **b.**    **U.S. Filter**

79.  Vivendi similarly violated GAAP by failing to write down impaired goodwill for its U.S. Filter acquisition.  While Vivendi recorded €4.577 billion in goodwill for U.S. Filter,  this goodwill should have been written down because U.S. Filter was misstating its reported revenue by improperly recognizing all of the revenue expected to be earned on multi-year contracts at the contracts' inception, as set forth more fully below.

80.  In the fourth quarter of 2001, Vivendi belatedly recorded a €2.6 billion impairment in the value of U.S. Filter's assets.  U.S. Filter's goodwill was overstated long before this write-down, which Defendants failed to take in violation of GAAP.

      **4.**    **Vivendi's Improper Recognition of Revenue On U.S. Filter**

81.  In addition to their failure to write down impaired goodwill for U.S. Filter, Defendants caused Vivendi improperly to recognize revenue on U.S. Filter in violation of GAAP.  CON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises,* provides that revenue should not be recognized until it is (a) realized or realizable and (b) earned.  Similarly, the SEC's Staff Accounting Bulletin No. 101 provides:

> [R]evenue should not be recognized until it is realized or realizable and earned.  SFAC No. 5, paragraph 83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major

or central operations, and *revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.*" Paragraph 84(a) continues *"the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers . . . ,* and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." In addition, paragraph 84(d) states that "If services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may be recognized as earned as time passes."

The staff believes that revenue generally is realized or realizable and earned when *all of the following criteria* are met:

- Persuasive evidence of an arrangement exists,
- Delivery has occurred or *services have been rendered*,
- The seller's price to the buyer is fixed or determinable, *and*
- Collectibility is reasonably assured.

Staff Accounting Bulletin No. 101 (emphasis added).

82.    Vivendi's Form 20-F for the fiscal year ended December 31, 2001 expressly represented that the Company was following these rules with regard to revenue recognition, stating:

> *Revenues on public service contracts are recognized as services are provided.*    Amounts billed and collected prior to services being *performed* are included in deferred revenues.

(emphasis added).

83.    In contravention of these clear rules—and of its own publicly-disclosed revenue recognition policies—Vivendi recognized anticipated revenue from multi-year public service contracts not as services were provided but, rather, upon the signing of such contracts.  As the plaintiffs alleged in the Securities Class Action, a former U.S. Filter officer contended that during the Class Period—which coincides directly with the Loss Period—Vivendi

Environmental, through its U.S. Filter subsidiary, materially overstated its operating results by implementing a practice known as "booking backlog." This practice permitted Vivendi improperly to recognize and report the *entire dollar amount of long-term fixed price contacts as revenue upon the signing of the contract*. A former U.S. Filter officer stated—according to the complaint filed in the Securities Class Action—that this practice permitted U.S. Filter to overstate revenue on major contracts by as much as ten times. In fact, Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during the year ended December 31, 2001—with its U.S. Filter subsidiary reporting €1.32 billion in revenue in 2000.

84.   Vivendi's financial statements were materially overstated during the Loss Period as a result of Defendants' improper recognition of revenue on U.S. Filter in violation of GAAP.

### 5.   Vivendi's Improper Inflation Of Canal+'s Assets

85.   In addition to the failure to write down goodwill discussed above, the reported value of Canal+'s assets on Vivendi's balance sheet was also materially and improperly inflated in other respects. Specifically, Vivendi reported as assets on its balance sheet €250 million "marketing rights" that Canal+ purportedly acquired through contracts with five French football league clubs. As set forth below, however, Hannezo knew—or recklessly failed to discover— that the purported "marketing rights" provided no economic benefit to Canal+ and, accordingly, could not properly be recorded as assets.

86.   According to the Securities Class Action complaint, after Vivendi acquired Canal+, Hannezo reviewed a memorandum dated January 29, 2001 that disclosed that the purported "marketing rights" Vivendi was recording as assets on its financial statements actually belonged to the football league, not to the individual teams with which Canal+ had contracted.

Accordingly, these "marketing rights" provided no economic benefit whatever to Canal+. Even though this memorandum flatly warned that recording these contracts as assets would put Vivendi in a "difficult" position with respect to U.S. GAAP reporting requirements, Defendants caused the Company to recognize these "marketing rights" as assets on its financial statements.

87.  Defendants violated U.S. GAAP by recording the "marketing rights" as assets on its financial statements.  CON No. 6, *Elements of a Financial Statement*, defines "assets" as "*probable future economic benefits* obtained or controlled by a particular entity as a result of past transactions or events." (emphasis added).  As set forth above, however, these "marketing rights" belonged to the football league, not the teams with which Canal+ had contracted. Accordingly, the "marketing rights" did not provide "probable future economic benefits" to Canal+ and were not "assets" under CON No. 6.  Vivendi recorded these rights as assets in its year-end financial statements for 2000—which were filed with the SEC on July 2, 2001—in violation of GAAP.

88.  In addition, Vivendi's overstatement of Canal+'s assets caused it to understate the goodwill it recorded for that acquisition.  As set forth above, ABP No. 16, *Business Combinations*, required Vivendi to record as goodwill the assets it acquired from Canal+ minus the liabilities it assumed as goodwill.  Because Vivendi overstated the fair value of Canal+'s marketing rights, it understated the goodwill it recorded for the Canal+ acquisition.

### 6.  **Vivendi's Improper EBITDA Manipulation**

89.  In addition to the accounting improprieties discussed above, Vivendi—in violation of GAAP—improperly adjusted certain of its subsidiaries' reserve accounts and made accounting entries without appropriate support in order to meet the aggressive 35% EBITDA growth the Company had predicted at the time of the Merger.

90.   According to a complaint filed against the Company by the SEC, in late June 2001,

Defendants became concerned that the Company would not meet its EBITDA target for the

quarter ended June 30, 2001.  To avoid this, Defendants caused Vivendi to make improper

adjustments that raised the Company's EBITDA by almost €59 million—almost 5% of the total

€1.12 billion EBITDA Vivendi had reported (excluding the results of the newly-acquired Maroc

Telecom) for that quarter.

91.   To increase artificially Vivendi's EBITDA, Defendants caused Cegetel to depart

from its historical methods of calculating its bad debt reserve during the second quarter of 2001.

This change in accounting methodology permitted Cegetel to take a lower provision for bad

debts during that quarter than its historical method would have required.  Specifically, Cegetel

recorded €45 million less for bad debt reserves that it would have had Defendants not caused it

to change its accounting methodology, artificially inflating Vivendi's EBITDA in that amount.

92.   Vivendi at this time fully consolidated Cegetel's results into its own, which were

reconciled to U.S. GAAP.  Under SFAS 5, *Accounting for Contingencies*, an entity's bad debt

reserve must reflect, at any given point in time, the estimated probable loss inherent in that

entity's accounts receivable.  Notably, SFAS 5 prohibits both the use of reserves, including

excess reserves, for general or unknown business risks and the systemic or time release of

reserves into income.  Paragraph 23 of SFAS 5 further provides that an estimate of losses on

accounts receivable "normally depend[s] on, among other things, the experience of the enterprise

. . . and the appraisal of the receivables in light of the current economic environment."

93.   The adjustments at Cegetel violated SFAS 5 because Cegetel reduced its provision

for bad debts in the second quarter of 2001 without the appropriate level of documentation or

analysis.  Moreover, that  Cegetel reduced its reserves at a time when it was actually having

more difficulty collecting on its bad debts strongly suggests that these reserves were being manipulated improperly. Accordingly, Cegetel's bad debt reserve did not reflect the probable loss inherent in its accounts receivable and therefore violated SFAS 5.

94. In addition, Defendants caused Cegetel to defer improperly to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that should have been booked in the second quarter of 2001. In *toto*, these improper adjustments amounted to €59 million—permitting Vivendi to meet its 35% EBITDA growth target for the second quarter of 2001.

95. Vivendi violated SFAS 5 by using Cegetel's bad debt reserves as an EBITDA manipulation tool. Because Cegetel's bad debt reserve accounts were not compliant with SFAS 5, Vivendi's financial statements violated U.S. GAAP.

96. In addition to the second quarter 2001 manipulations with respect to Cegetel, the SEC complaint charges that the Company improperly boosted the results of its UMG music division in the third quarter 2001 to meet a predetermined €250 million EBITDA goal for the division through two improper maneuvers. First, Defendants caused UMG to recognize prematurely a little more than €3 million in deferred revenue that it received in connection with a contract between UMG and other parties *that UMG itself had deferred recognizing* in light of the fact that it would need to be refunded if the parties to the contract failed to meet certain conditions by December 2001. Recognizing this €3 million as revenue before all the conditions were met violated SFAS 48, *Revenue Recognition When A Right Of Return Exists*. Accordingly, the Company's financial statements violated GAAP.

97. Second, in late October 2001, Defendants caused Vivendi to reduce temporarily the amount of corporate overhead charges it allocated to UMG by €7 million. Coincidentally, this

reduction in corporate overhead charge equaled the exact amount of additional earnings that
Vivendi's senior executives determined UMG would need to reach the €250 million EBITDA
goal for the division.

98.  Defendants' change in the overhead allocated to UMG violated CON No. 6, which
provides that allocations must be assigned and distributed "according to a plan or a formula."
Further, this change in overhead allocation violated SFAS 131, *Disclosures About Segments of
An Enterprise and Related Information,* which provides that amounts allocated to reported
segment profit or loss "shall be allocated on a reasonable basis." Defendants changed the
amount of corporate overhead allocated to UMG based not on a plan or formula but, rather, to
meet a predetermined EBITDA target. Accordingly, Vivendi's financial statements violated
U.S. GAAP.

### 7.    Vivendi's Failure To Report Pro Forma Metrics Properly

99.  In addition to the EBITDA manipulations described above, Vivendi also violated
GAAP through its failure to report pro forma metrics properly. Notably, Vivendi's unique
definition of EBITDA—which served as the basis for calculating both its Operating Income and
Operating Free Cash Flow—enabled it to include all amounts from consolidated subsidiaries,
even those that were not wholly-owned like Cegetel and Maroc Telecom. Contrary to the
Company's approach, EBITDA does not normally include the amount of earnings from
consolidated subsidiaries attributable to minority shareholders.

100. Under GAAP, pro-forma amounts—such as EBITDA—are considered to be
supplemental disclosures designed to assist readers of financial statements in their understanding
of certain transactions that generally relate to the effect of accounting changes (APB 20,
*Accounting Changes*) and business acquisitions (APB 16 and SFAS 141, *Business*

*Combinations*). SEC Regulation S-X, Article 11 – *Pro Forma Financial Information* - requires

pro forma disclosures in connection with business combinations and for other events or

transactions for which disclosure of pro forma financial information would be beneficial to

investors. Further, the SEC requires a reconciliation of pro forma amounts with the most directly

comparable GAAP amount. For instance, EBITDA would be reconciled to Net Income. CON

No. 1, *Objectives of Financial Reporting*. Vivendi, however, misstated its EBITDA by

consolidating the results of Cegetel and Maroc Telecom. Accordingly, Vivendi failed to report

pro forma metrics properly in violation of GAAP.

### 8.    Vivendi's Failure To Disclose Its 2% Indirect Interest In Elektrim Telekomunikacja

101. In 1999, Vivendi made a €1.198 billion investment in a joint venture with Elektrim

Telekomunikacja ("Telco") that gave the Company a 49% interest in a company that controlled

Polish mobile telephone operator PTC and Polish cable operator Bresnan. On June 28, 2001,

Vivendi announced a memorandum of understanding pursuant to which it would increase this

stake from 49% to 51% via an additional €100 million investment.

102. Vivendi failed to consolidate Telco's results into its own in violation of ARB 51,

*Consolidated Financial Statements*, SFAS 94, *Consolidation of All Majority-Owned*

*Subsidiaries*, and APB No. 18, *The Equity Method of Accounting for Investments in Common*

*Stock*. Notably, APB No. 18 required Vivendi to apply the equity method of accounting to its

Telco investment. Under APB No. 18, Vivendi was required to recognize its share of Telco's

earnings or losses in its financial statements.

103. Unfortunately for Vivendi, Telco—which it was not only permitted but *required* to

consolidate under GAAP—was losing money instead of making it. In fact, Vivendi disclosed in

its Forms 20-F that Telco's net income was (€31 million) and (€28 million) in 2000 and 2001,

respectively. To avoid having to record Telco's losses on its own balance sheet, Vivendi flouted

GAAP by opting simply to not consolidate Telco. Vivendi overstated its income by failing to

consolidate Telco's results into its own following its acquisition of majority control of that

entity.

9.    **Vivendi Violated The Terms Of Its Own Publicly-Disclosed**
      **Accounting Policies**

104. Vivendi also violated GAAP by failing to adhere to the terms of its significant

accounting policies as publicly disclosed to the Company's shareholders. ABP 22, *Disclosure of*

*Accounting Policies,* provides:

> Disclosure of accounting policies should identify and describe the
> accounting principles followed by the reporting entity and the
> methods of applying those principles that materially affect the
> determination of financial positions, cash flows, or results of
> operations.

As set forth more fully below, Vivendi failed to comply with the terms of its "Significant

Accounting Policies and Practices" as disclosed in its Forms 20-F in violation of ABP 22.

105. In addition to violating GAAP, Defendants' (1) improper consolidation of Cegetel

and Maroc Telecom and (2) failure to consolidate Telco violated the terms of Vivendi's own

accounting policies as disclosed in its Forms 20-F. Vivendi's Forms 20-F described the

Company's policies for such accounting as follows:

> Principles of Consolidation and Accounting for Investments . . . All
> companies in which Vivendi Universal has greater than a 50%
> ownership interest or legal or effective control are consolidated. In
> addition, Vivendi Universal only consolidates a subsidiary if no other
> shareholder or groups of shareholders exercise substantive
> participating rights, which would allow those shareholders to veto or
> block routine decisions taken by Vivendi Universal.

Under the terms of the Company's accounting policies as disclosed in its Forms 20-F, neither

Cegetel nor Maroc Telecom should have been consolidated. Further, Telco should have been

consolidated.

106. Similarly, Defendants' understatement of bad debt reserves at Cegetel violated the

Company's own accounting policies, which were disclosed as follows in Vivendi's Forms 20-F:

> Use of Estimates. The preparation of financial statements in
> conformity with generally accepted accounting principles requires
> management to make informed estimates, assumptions and
> judgments, with consideration given to materiality, that affect the
> reported amounts of assets, liabilities, revenues and expenses and the
> disclosure of contingent assets and liabilities in the consolidated
> financial statements and accompanying notes.

As set forth above, Defendants reported debt reserves at Cegetel not because they had made an

"informed judgment" as to the propriety of the levels of such reserves but, rather, to manipulate

EBITDA.

107. Defendants' premature recognition of revenue at UMG and U.S. Filter also violated

the Company's accounting policies. The Company's Forms 20-F stated:

> Revenues and Costs
>
> Music — *Revenues from the sale of recorded music, net of a
> provision for estimated returns and allowances, are recognized upon
> shipment to third parties.*
>
> Environmental Services — *Revenues on public service contracts are
> recognized as services are provided.* Amounts billed and collected
> prior to services being performed are included in deferred revenues.
> … Revenues from long-term contracts involving a substantial
> construction component are recorded on the percentage-of-
> completion basis.

(emphasis added). As set forth above, Defendants prematurely recognized revenue at UMG and

U.S. Filter in violation of these policies.

108. Defendants also recorded worthless marketing rights, in violation of accounting

policies listed in the Forms 20-F:

> Goodwill and Business Combinations All business combinations are
> accounted for as purchases. Under the purchase accounting method,
> assets acquired and liabilities assumed are recorded at fair value. The
> excess of the purchase price over the fair value of net assets acquired,
> if any, is capitalized as goodwill and amortized over the estimated
> period of benefit on a straight-line basis.
>
> * * *
>
> Other Intangible Assets Vivendi Universal has significant acquired
> other intangible assets, including music catalogs, artists' contracts,
> music and audiovisual publishing assets, film and television libraries,
> international television networks, editorial resources and plates,
> distribution networks, customer relationships, copyrights and
> trademarks, among others. Acquired music catalogs, artists' contracts
> and music publishing assets are amortized over periods ranging from
> 14 to 20 years, most other intangibles are amortized over a 40-year
> period, on a straight-line basis.

109. Similarly, Defendants' failure to record a goodwill impairment charge violated U.S.

GAAP and the following accounting policy contained in Vivendi's Forms 20-F:

> Valuation of Long-Lived Assets Vivendi Universal reviews the
> carrying value of long-lived assets, including goodwill and other
> intangible assets, for impairment at least annually or whenever facts,
> events or changes in circumstances, both internally and externally,
> indicate that the carrying amount may not be recoverable.

### C. Vivendi Conceals A Growing Liquidity Crisis

110. Vivendi's costly acquisitions left the Company strapped for cash, creating a liquidity

crisis that threatened its very survival. In addition to the improper accounting discussed above,

Defendants took active steps to conceal this growing liquidity crisis, hoping to thereby prop up

the Company's stock and assure its continued access to financing.

- 41 -

### 1.    Vivendi Fails To Disclose It Inability To Generate Expected Cash Flows From Its Costly Acquisitions

111. A number of Vivendi's most significant acquisitions—including, as set forth above, Canal+ and U.S. Filter—were not generating the expected revenue that would have been required to justify Vivendi's publicly-reported "goodwill." Defendants engaged in the improper accounting described above in an effort to conceal from Plaintiff and the investing public that the cash flows from these massive and costly acquisitions were falling far short of expectations.

### 2.    Vivendi Fails To Disclose The Insufficiency Of Its Working Capital

112. Further, Defendants failed to disclose the insufficiency of Vivendi's working capital. Pursuant to Item 5B of the Instructions, Vivendi's Forms 20-F were required to include "a statement by the company that, in its opinion, the working capital is sufficient for the company's present requirements, or, if not, how it proposes to provide the additional working capital needed." In addition, Paragraph 49 of CON 1, *Objectives of Financial Reporting By Business Enterprises*, provides:

> Financial reporting should provide information about how an enterprise obtains and spends cash, about its borrowing and repayment of borrowing, about its capital transactions, including cash dividends and other distributions of enterprise resources to owners, and about other factors that may affect an enterprise's liquidity or solvency.

CON 1 at ¶ 49. Defendants failed to comply with the Instructions for completing their Forms 20-F and violated CON 1 by—as set forth above—failing to disclose that (1) cash from Cegetel and Maroc Telecom was not available to the Company, even though the results of these entities were consolidated in Vivendi's financial results and (2) the Cegetel current account—as described below—severely impacted the Company's liquidity.

- 42 -

### 3.   Vivendi Fails To Disclose Acceleration Clauses In Its Loans

113. Further, Vivendi failed to disclose that maturity dates on major loans would accelerate in the event of a downgrade in Vivendi's credit rating.  Specifically, an acceleration clause in one of Vivendi's loan agreements provided that it could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip.

114. Vivendi violated the SEC's Instructions for filing Forms 20-F by failing to disclose these acceleration clauses. Item 5B of the Instructions to Form 20-F required the Company to disclose "information on the level of borrowings at the end of the period under review, the seasonality of the borrowing requirements and *the maturity profile of borrowings and committed borrowing facilities, with a description of any restrictions on their use.*"  Item 5.B(1)(c) (emphasis added).  Vivendi failed to disclose a very significant restriction on its use of the funds it had borrowed—namely, that it could be required to return immediately all amounts outstanding if its credit ratings slipped.

### 4.   Vivendi Fails To Disclose Its Narrow Avoidance Of A December 2001 Credit Downgrade

115. Due—among other reasons—to acceleration clauses in its borrowing facilities, Vivendi sought at all costs to maintain its credit ratings at high levels.  When the Company was threatened with a credit downgrade in December 2001, Defendants failed to disclose this near-miss to investors.  As reported in The Wall Street Journal, Vivendi narrowly avoided a credit downgrade on December 13, 2001, "which would have made it difficult to borrow money and plunged the company into a cash crisis."  Learning of this potential disaster, Hannezo sent Messier "a desperate handwritten plea.  'I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat,' wrote Mr. Hannezo, the company's chief financial officer.  'All I ask is that all of this not end in shame.'"  John

Carreyrou and Martin Peers, *Damage Control: How Messier Kept Cash Crisis At Vivendi Hidden for Months —Media Giant Was At Risk Well Before Investors Knew,* The Wall Street Journal, Oct. 31, 2002, at A1.

### 5.    Vivendi Fails To Disclose Material Commitments Concerning Cegetel and Maroc Telecom

116. In its Forms 20-F for 2000 and 2001—and, according to a complaint filed against Vivendi by the SEC, in key meetings with analysts from Moody's Investors Services ("Moody's") and Standard & Poor's in December 2001—Defendants failed to disclose future commitments regarding Cegetel and Maroc Telecom that would  have revealed grave doubts about the Company's ability to meet its cash needs.

#### a.    The Cegetel Current Account

117. In the summer of 2001, Defendants caused Vivendi to enter into an undisclosed current account with Cegetel, its most profitable and cash-flow positive subsidiary.  Under this current account—which operated in much the same manner as a loan—Cegetel delivered excess cash to Vivendi on a short-term basis beginning in August 2001.  Vivendi paid Cegetel a market rate of interest and agreed to return the funds at the expiration of the current account agreement on December 31, 2001.[3]

118. While Vivendi maintained cash pooling arrangements with most of its subsidiaries, it treated the funds it received from Cegetel differently than it treated these other pooling arrangements.  In addition to the specific expiration date mentioned in the preceding paragraph, the Cegetel current accounts contained an "on demand" clause that entitled Cegetel to demand immediate reimbursement of the funds it deposited with Vivendi at any time.

---

[3]     The return date was subsequently extended to July 31, 2002.

119. Cegetel gave Vivendi approximately €520 million pursuant to the current account in August 2001. This account balance ballooned between September 2001 and June 2002, at times exceeding €1 billion. Vivendi used the money Cegetel gave it under the current account to pay for ordinary operating expenses.

120. Cegetel's right to demand immediate reimbursement of the funds it provided to Vivendi under the current account had a direct impact on the Company's liquidity. Vivendi, however, declined to disclose the existence of this account in its Form 20-F filed with the SEC on May 28, 2002. Item 5B(1)(b) of the instructions for filing Form 20-F, *Liquidity and Capital Resources*, required Vivendi to include in its financial statements the nature and extent of any legal or economic restrictions on the ability of subsidiaries to transfer funds to the Company and to disclose the impact such restrictions have had or are expected to have on its ability to meet its cash obligations. Vivendi failed to make the required disclosure in violation of Item 5B(1)(b).

121. Similarly, Vivendi's failure to disclose the current account violated Item 303 of SEC Regulation S-K. Item 303 requires issuers to identify any known "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." Vivendi violated Item 303 by failing to disclose the Cegetel current account.

122. In addition to violating SEC regulations, Vivendi violated GAAP by failing to disclose the Cegetel current account. Paragraph 2 of SFAS 57, *Related Party Disclosures,* provides:

> *Financial statements shall include disclosures of material related party transactions,* other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business . . . The disclosures shall include:
>
> a.    The nature of the relationship(s) involved;

      b.     A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

      c.     The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

      d.     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

(emphasis added). Vivendi violated SFAS 57 by failing to disclose the Cegetel current account.

### b.    The Maroc Telecom Side Agreement

123. In February 2001, Vivendi entered into a side agreement with Maroc Telecom to purchase an additional €1.1 billion stake in that entity. Defendants failed to disclose this side agreement.

124. As discussed above, Vivendi acquired a 35% stake in Maroc Telelcom in December 2000. In February 2001, Vivendi entered into a side agreement with the Moroccan government that required the Company to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion. In return, the Moroccan government granted Vivendi certain management rights over the Telecom's operations that Vivendi used to justify its consolidation on the Company's financial statements. This side agreement was not disclosed in Vivendi's public filings in 2001 and early 2002. By failing to disclose this €1.1 billion liability, Defendants were able to conceal Vivendi's burgeoning cash crunch.

125. By concealing Vivendi's liquidity crisis, Defendants were able temporarily to keep the Company's stock prices and credit ratings at artificially high levels. When the truth hit the market in July 2002, however, Defendants' carefully-crafted house of cards collapsed, and the Company's common shares and ADSs cratered.

## VI. **VIVENDI'S FALSE AND MISLEADING STATEMENTS**

126. On October 30, 2000, Defendants filed Vivendi's Form F-4 (the "F-4"), signed by Messier and Hannezo, with the SEC. The F-4 contained the registration and prospectus for the Merger. Further, the F-4 contained Vivendi's historical financial statements for the fiscal year ended December 31, 1999 and the first half of the fiscal year 2000, ended June 30, 2000. Vivendi reported sales of $16.427 billion and net income of $509.1 million for the first half of the fiscal year ended December 31, 2000, and revenue of $17.487 billion and net income of $254.6 million for the comparable period in 1999. Vivendi also reported shareholders' equity of $11.957 billion and total assets of $73.611 billion as of June 30, 2000.

127. For the reasons set forth in greater detail in Section V.B, *supra*, Vivendi's historical financial statements and balance sheets contained in its F-4 contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings, including (a) improperly consolidating into its financial statements revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b) failing timely to write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter; (c) overstating the Company's revenue from its Environnemental division on certain multi-year contracts; and (d) failing to adhere to the accounting policies described in its SEC filings. In addition, the F-4 contained untrue statements of material fact and omitted to state

- 47 -

material facts required therein or necessary to make the statements therein not misleading

because Defendants did not disclose that Vivendi was suffering from a burgeoning liquidity

crisis, as set forth above at Section V.C.

128. On November 1, 2000, Defendants caused Vivendi to file a Form 6-K reporting

Vivendi's financial results for first half of 2000, ended June 30, 2000 (the "November 1, 2000 6-

K"). The November 1, 2000 6-K stated in pertinent part:

> For the first six months of 2000, Vivendi generated net sales of 19.4
> billion euros compared with 18.1 billion euros for first-half 1999,
> representing growth of 7.4%. This amount takes into account the
> disposals of Vinci and Nexity with effect from January 1, 2000. It
> also includes a full six months' impact from the major acquisitions
> made in 999, notably U.S. Filter and Canal+.
>
>           \* \* \*
>
> The communications and Environnemental services businesses
> accounted for 18.6 billion euros, an increase of 46% which includes
> internal growth of over 15%. Net sales outside France rose 74% to
> 8.6 billion euros.

129. On November 17, 2000, Defendants caused Vivendi to file a 6-K announcing

Vivendi's revenue for the first nine months of 2000 (the "November 17, 2000 6-K"). The filing

reported that Vivendi's revenues for the first nine months of 2000 were as follows:

> 29.1 billion euros, with Environnemental services and
> communications accounting for 28.2 billion euros, a 41.5% increase
> over the 19.9 billion euros as at September 30, 1999. Internal growth
> was close to 14% (19% in communications and 11% in
> Environnemental services).

130. The November 1, 2000 6-K and the November 17, 2000 6-K contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, the Company was engaged in

improper accounting practices that had the effect of materially overstating Vivendi's reported

earnings (as particularized in Section V.B, *supra*), including: (a) failing to timely write down

- 48 -

certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; (c) failing to consolidate revenue from Telco; and (d) overstating the Company's revenue from certain multi-year contracts. In addition, the November 1, 2000 6-K and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above at Section V.C.

131. On December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom for approximately €2.3 billion. The press release stated that the purchase would "have a positive effect on net income before goodwill from 2001, taken that the company is consolidated." This statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the consolidation of Maroc Telecom was improper, for the reasons set forth above.

132. On January 12, 2001, Defendants caused the text of a December 5, 2000 speech to shareholders to be memorialized in a January 12, 2001 Form 6-K filed with the SEC (the "January 12, 2001 6-K"). In the speech, Messier touted Vivendi's quadrupled share price, sevenfold increase in market capitalization, and tenfold increase in operating income. He also reported Vivendi's pro forma revenues of "almost 25 billion euros at the end of 2000, and pro forma EBITDA of 3.2 billion euros in the consolidated businesses alone." Calling the figures "reliable and concrete," Messier projected an additional €220 million of EBITDA in 2002 and more than €400 million in 2003. He went on to state that "[w]e are therefore very comfortable

with our business and financial performance forecasts, irrespective of the economic climate in the next two years." Messier's December 5, 2000 speech—and the January 12, 2001 6-K on which it was filed— contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the financial results reported therein, rather than being "reliable and concrete," were achieved as a result of the fraudulent accounting scheme described in Section V.B, *supra*. Further, the revenue and EBITDA results reported in the December 5, 2000 speech—and the January 12, 2001 6-K on which it was filed—were materially false and misleading because Defendants' improper consolidation of the results of Cegetel and Maroc Telecom into Vivendi's own results caused these reported financial results to be materially misstated.

133. On February 2, 2001, Vivendi announced Vivendi Environnement's 2000 results. Total revenue was €26.4 billion. Vivendi cited "internal growth of 10.5% and major acquisitions in 1999" as the primary catalysts behind the 25.7% increase over its 1999 revenues. The press release stated that "[c]hanges in the scope of consolidation had a positive impact of €2 billion. External growth was mainly due to the full year effect of acquisitions made in 1999, principally U.S. Filter and Superior Services." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi's reported revenue was overstated as a result of the accounting improprieties discussed above in Section V.B.2, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting improprieties discussed above in Section V.B, *supra*.

- 50 -

134. On February 14, 2001, Vivendi issued a press release in Paris and New York,

memorialized in a February 15, 2001 6-K filing with the SEC (the "February 15, 2001 6-K").

The February 15, 2001 6-K announced preliminary results for the fiscal year ended December

31, 2000 as follows:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7
> billion Euros, with media and communications and environmental
> services accounting for 40.0 billion euros, a global 36.5% increase
> over 1999. [Messier said that:] "Vivendi Universal was created on
> December 8, 2000. The 2000 Vivendi [Universal] figures are
> showing the considerable burst of growth of our communications
> activities in 2000 both in global growth and even more important
> with a near 20% internal growth. Vivendi Universal enters its first
> full year of operations with strong growth prospects and a very strong
> balance sheet. This new company is off to a fast start and we are very
> confident that we will meet the very aggressive growth targets we
> have set for ourselves both at the revenues and EBITDA levels.

135. The February 15, 2001 6-K contained untrue statements of material fact and omitted

to state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi's reported revenues were overstated as a

result of the accounting improprieties discussed above in Section V.B, *supra*. Further, the

February 15, 2001 6-K contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because

Defendants failed to disclose that the results reported were not attributable to the stated causes

but, rather, to the accounting improprieties discussed above in Section V.B, *supra*.

136. In a March 8, 2001 Form 6-K (the "March 8, 2001 6-K"), Defendants caused

Vivendi to report on a Supervisory Board meeting held the same day and chaired by Messier

wherein Vivendi Environnement's financial statements were discussed. The release stated in

part that "[n]et debt was reduced from 16.6 billion euros to 13.2 billion euros, and shareholders'

equity – including minority interests – was increased from 1.5 billion euros to 8.2 billion euros."

Vivendi Universal further announced that net income was €615 million, including non-recurring items after tax.

137. In a March 9, 2001 Form 6-K signed by Messier (the "March 9, 2001 6-K"), Vivendi reported "better than expected" fourth quarter and FY 2000 results. Vivendi announced actual revenues of €41.8 billion for FY 2000, including Media & Communications revenues of €13.6 billion and Environnemental Services revenues of €26.5 billion. The 6-K further stated:

> Vivendi Universal announced today that on a pro forma basis for calendar 2000, the Company reported 7.2 billion euros in EBITDA . . . for the period ending December 31, 2000, up 48 percent from 1999. Results reflect strong performance across the Company's business units -- Media & Communications and Environnemental Services. Actual EBITDA for the 12 months ended December 31, 2000, was 6 billion euros versus 4.3 billion euros in 1999.

138. Vivendi claimed that "the pro forma results were driven by growth in all business segments with the exception of Internet" and further pointed out that "[n]et income climbed 44 percent, before goodwill, to 2.8 billion euros, from 1.4 billion euros." Messier further stated:

> The strong results that Vivendi Universal has generated for calendar 2000 provide a very solid foundation for the Company's growth prospects in 2001. The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001. The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies. The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of each of the Company's business units. I am very confident that, for Media & Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders. . . .Our businesses are strong, our management is focused and growth prospects are real and immediate.

The March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not

- 52 -

misleading because Defendants failed to disclose that the reported results were not
attributable to the stated causes but, rather, to the accounting improprieties discussed
above in Section V.B, *supra*.

139. In addition to the reasons discussed above, the January 12, 2001 6-K; the February
15, 2001 6-K; the March 8, 2001 6-K; and the March 9, 2001 6-K contained untrue statements of
material fact and omitted to state material facts required therein or necessary to make the
statements therein not misleading because, *inter alia*, the Company was engaged in improper
accounting practices that had the effect of materially overstating Vivendi's reported earnings (as
particularized in Section V.B, *supra*), including: (a) failing to timely write down certain
overvalued assets from previous corporate investments and acquisitions; (b) improperly
consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the
Company had less than 50% ownership; (c) improperly recognizing revenue from its U.S. Filter
and Canal+ acquisitions; and (d) failing properly to report pro forma metrics.  Further, these
statements contained untrue statements of material fact and omitted to state material facts
required therein or necessary to make the statements therein not misleading because Defendants
failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above
at Section V.C.

140. In a March 30, 2001 Chairman's Statement and Shareholder Newsletter, filed with
the SEC on a Form 6-K on the same date (the "March 30, 2001 6-K"), Messier stated that 2000
pro forma results showed an increase of 20% in revenues and an EBITDA increase of 48%, and
that "[t]he EBITDA rise for the media and communications businesses alone is strong[], reaching
76%."  Messier also pointed out that Vivendi was "ahead of our targets for 2000" and that he

could "confirm the ambitious growth targets . . . for media and communications in October

2000: increases of 10% revenues and 35% for EBITDA." He further stated:

> Since the merger [with Seagram and Canal+], the integration of our
> teams has progressed well, enabling us to identify and develop
> synergies. Consumers will soon be seeing the first concrete results.
> In addition, we are in exceptionally fine financial health – our
> communications activities are nearly debt free.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Messier

failed to disclose that Vivendi was neither "in exceptionally fine financial health" nor "nearly

debt free." Further, these statements contained untrue statements of material fact and omitted to

state material facts required therein or necessary to make the statements therein not misleading

because Messier failed to disclose that Vivendi was in a precarious financial condition due to the

fraudulent accounting scheme and Defendants' active effort to conceal Vivendi's liquidity crisis,

as discussed above in Sections V.B and V.C, *supra*.

141. On April 24, 2001, Vivendi issued a press release and filed a 6-K (collectively, the

"April 24, 2001 6-K") announcing "very strong" first quarter 2001 results. The April 24, 2001

6-K announced that Media & Communications' revenues were up 10% to €5.9 billion and that

Telecom's revenues were up 30% to €1.5 billion. The April 24, 2001 6-K further reported that

Media & Communications' EBITDA increased 112% to €900 million and that Telecom's

EBITDA more than tripled to €433 million. The April 24, 2001 6-K quoted Messier as follows:

> I am very pleased with Vivendi Universal's outstanding performance
> in our first quarter as a new company. All our results meet or exceed
> our key operating targets. We created significant momentum by
> delivering solid first quarter 2001 results in EBITDA, which more
> than doubled, and by generating double digit revenue growth.
>
> These results show the focus and dedication of all our management
> teams, in executing the unique promise of Vivendi Universal around
> its global strategy. This is a great beginning. With our momentum,

> our targets and the drive of our executive team, I am extremely
> confident that, for Media & Communications, we will reach our
> annual EBITDA and revenue growth targets of 35% and 10%,
> respectively in 2001 and 2002 and achieve superior returns for
> Vivendi Universal shareholders.
>
> We are also ahead of targets for the synergies which indicate that the
> path of integration between our teams is great. My only focus is and
> remains execution of this compelling media merger.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the results reported were not attributable to the stated caused but, rather, to

the fraudulent accounting scheme described above in Section V.B, *supra*.

142. On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's

shareholders' meeting, the transcript of which was subsequently filed on the June 26, 2001 Form

6-K (collectively, the "June 26, 2001 6-K"):

> The foundations of our communications related businesses are
> particularly healthy and strong. I would just like to emphasize a few
> points:
>
> a healthy balance sheet with total equity reaching 66 billion Euros;
>
> a pro forma net debt that is practically non-existent - around three
> billion Euros;
>
> Vivendi Universal posted record-high net income, and has cash
> available for investing (participation in BskyB, etc.);
>
> Vivendi has rapidly growing revenue, which reach the double digits
> annually, spread out through all the European and American markets
> (60% and 40%); extraordinarily large customer bases; several dozen
> million subscribers; business models often based on subscription -
> meaning loyalty, recurrence, predictable revenues, and very little
> dependence on the advertising market.
>
> Financially, Vivendi Universal, concerning the communications
> sectors, is rock solid - very stable with high growth.

* * *

- 55 -

> In my role as the chairman and as an employee of the company, I owe
> you the company's results. Here they are. They are good. . . .
> Vivendi Universal, our company, your company, is solid. Today, we
> are a leader, strong, dynamic, and profitable.

143. On May 18, 2001, Vivendi filed a Form 6-K with the SEC and issued a press release

providing total revenue information for first quarter 2001 (collectively, the "May 18, 2001 6-K").

The May 18, 2001 6-K stated in part:

> Vivendi Universal revenue for first quarter of 2001 totaled 12.6
> billion euros, a global 34.5% increase over the first quarter of the
> prior year.    Vivendi Universal's media and communications
> businesses accounted for 5.9 billion euros and environmental services
> businesses accounted for 6.7 billion euros.

144. In addition to the reasons discussed above, the March 30, 2001 6-K; the April 24,

2001 6-K; the June 26, 2001 6-K; and the May 18, 2001 6-K contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading because, *inter alia*, the Company was engaged in improper

accounting practices that had the effect of materially overstating Vivendi's reported earnings (as

particularized in Section V.B above), including: (a) failing to timely write down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into

its financials revenue from its Cegetel subsidiary in which the Company had less than 50%

ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In

addition, these statements contained untrue statements of material fact and omitted to state

material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as

particularized in Section V.C above) and that Vivendi would need to restructure its debt

obligations in order to remain solvent and avoid bankruptcy.

- 56 -

145. On July 2, 2001 Vivendi filed its Form 20-F, signed by Hannezo, for the fiscal year

ended December 31, 2000 with the SEC (the "2000 Form 20-F"). The 2000 Form 20-F

contained Vivendi's consolidated financial statements for the years ended December 31, 2000,

1999 and 1998 and as at December 31, 2000 and 1999. The 2000 Form 20-F stated as follows:

> For the years ended December 31, 2000, 1999 and 1998, we had a net
> income under U.S. GAAP of €1,907.8 million, € 246.1 million and
> €565.2 million, respectively, compared to €2,229.0 million, €1,431.4
> million and €1,120.8 million under French GAAP.  Under U.S.
> GAAP, shareholders' equity was €64,729.4 million and €16,954.5
> million for 2000 and 1999, respectively, compared to €56,671.1
> million and €10,892.2 million under French GAAP.

146. The 2000 Form 20-F further reported on marketing rights, stating:

> As of January 1, 2000, the following new accounting principles were
> adopted:
>
> * * *
>
> Sports broadcasting rights acquired by Canal Plus are now capitalized
> as intangible assets and are amortized over the period of the
> agreement.  The cumulative effect of this change had no impact on
> net income in 2000 and 1999.  Total assets increased by €2.0 billion
> (most of which related to intangible assets) and total liabilities and
> shareholders' equity increased by the same amount.

147. When discussing Accounting Policies, the 2000 Form 20-F stated that revenues and

costs for the music segment were recognized upon shipment to third parties and that revenue

relating to public service contracts was recognized when the services were rendered.

148. For the reasons set forth in greater detail in Section V.B, *supra*, Vivendi's historical

financial statements and balance sheets contained in its 2000 Form 20-F contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, Defendants failed to disclose that

the Company improperly consolidated into its financials revenue from its Cegetel subsidiary (in

which the Company had less than 50% ownership), improperly manipulated EBITDA, failed to

timely write down impaired goodwill from previous corporate investments and acquisitions, including Canal+ and U.S. Filter, overstated the Company's revenue from its Environmental division on certain multi-year contracts in violation of GAAP, failed to adhere to the accounting policies described in its SEC filings, and inflated the value of certain Canal+ assets. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above at Section V.C.

149. On July 23, 2001, Vivendi Universal issued a press release and filed a Form 6-K (collectively, the "July 23, 2001 6-K") announcing its "very strong" second quarter and first half 2001 Media & Communications results. Vivendi reported Media & Communications' revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew 57% to €1.3 billion. Concerning Vivendi's first half 2001 results for Media & Communications businesses, the press release stated in part:

> In the course of the first half of 2001, Vivendi Universal achieved three quarters of its full-year target of incremental EBITDA (nearly 800 million euros excluding Maroc Telecom, relative to the company's target of slightly more than 1 billion euros).
>
> In the first half of 2001, revenues increased to 12.4 billion euros (up 15% [excluding USG]), and EBITDA *grew* to 2.2 billion euros (up 77% over 2000 comparable period).
>
> During a strong second quarter, revenues increased 16% to 6.6 billion euros, and EBITDA grew 57% to 1.3 billion euros.
>
> Excluding Maroc Telecom, revenue growth was 8%, and EBITDA growth was 35% for the second quarter. For the first half of 2001, revenues were up 11% and EBITDA was up 62%. [footnotes omitted]

150. The July 23, 2001 6-K also reported on the Telecom segment, reporting

> Telecom EBITDA was €703m for the quarter ended June 30, 2001
> and €1.1b for the first half ended June 30, 2001.
>
> * * *
>
> Telecom registered an excellent second quarter and a half year. The
> second quarter of 2001, revenues increased by 51%, and EBITDA
> grew by 70% versus second quarter 2000.

151. Messier commented on the results, stating in part as follows:

> The results produced by Vivendi Universal in the second quarter are
> well ahead of market consensus. . . . They confirm the robustness of
> our businesses . . . and the fast progress of the reorganization and
> implementation of our recent merger.
>
> With three quarters of the 'aggressive' incremental EBITDA target
> for the full year 2001 [(1.12 billion euros of incremental EBITDA, or
> 35%, over the pro forma 2000 guidance provided last October and
> slightly above 1 billion euros of incremental EBITDA over the final
> 2000 results)] already achieved in the first half of the year, I can only
> re-emphasize our confidence. We will at least meet our stated
> targets.
>
> Obviously, our current stock price does not fully reflect this situation
> in terms of EBITDA multiples or Enterprise Value to EBITDA to
> growth. With the highest growth rates of the industry and the lowest
> multiples, our stock is definitely an attractive investment today.
>
> The first half has been a period of total operational focus in each of
> our businesses, while completing significant achievements in the
> implementation of the merger, reorganization and execution of our
> strategy.

152. Following the July 23, 2001 press release, Vivendi hosted a conference call to

discuss the second quarter 2001 results and the Company's business and prospects. A July 26,

2001 analyst report by Commerzebank reported that "Messier is confident the company will

reach its own targets." As the plaintiffs in the Securities Class Action allege, during the

conference call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and
> was in fact gaining market share.

- 59 -

> The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that Vivendi was able to achieve the purportedly "strong results" reported only as a result of the accounting improprieties discussed above in Section V.B, *supra*, and Defendants' active concealment of the Company's burgeoning liquidity crisis, as discussed above in Section V.C, *supra*.

153. On August 10, 2001, Vivendi Universal issued a press release and filed a 6-K (collectively, the "August 10, 2001 6-K") announcing its total revenue for the first half of 2001, including the second quarter. Second quarter 2001 revenue totaled €13.9 billion, "comprised of 6.6. billion euros for media communications businesses and 7.3 billion euros for environmental services businesses." The first half of 2001 total revenue for Vivendi Universal was €26.4 billion, "comprised of 12.4 billion euros for media and communications businesses and 13.9 billion euros for environmental services businesses."

154. In early September 2001, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s. In response, Defendants categorically denied any problems. Vivendi, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002. Messier stated in an interview with Reuters that evening that "no profit warning of any kind needs to be feared coming from Vivendi Universal." Messier's statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi's security in its targets and in the fact that it would not have to issue any profit warning was attributable to the accounting improprieties discussed above in

- 60 -

Section V.B, *supra*, and to its active concealment of the Company' liquidity crisis discussed above in Section V.C, *supra*.

155. On September 25, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "September 25, 2001 6-K") announcing "Strong First Half 2001" results and a "Solid Outlook for 2002." The press release reported that revenues increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per share. With respect to Media & Communications, the release reported that first half 2001 revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion, up 77%, and that operating income nearly tripled to €946 million, up 184%. Concerning Vivendi's Environnement business, the release reported that revenues were up 11% to €13.9 billion, that EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97 billion. In the filing, Messier commented:

> Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the 2001 year. I continue to express my confidence in achieving our more than 10% revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant asset base. This, combined with some extensions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media & Communications EBITDA slightly north of 5 billion euros. In the current Environnement, giving a 2002 target would not be meaningful, and we have yet to complete our 2002 budget and plan process. Before the recent tragedy [of September 11], market consensus for 2002 EBITDA was not far from 6 billion euros. Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently very confortable [sic] with this expectation. (Footnote omitted.)

156. On October 17, 2001, Vivendi Universal filed a Form 6-K (the "October 17, 2001 6-K") announcing its consolidated half-year financial statements as filed with regulatory authorities in France. The October 17, 2001 6-K reported:

In the first half of 2001, Vivendi Universal's revenues increased to €26.4 billion from €19.4 billion in the comparable period of 2000. On a pro forma basis the revenue increase was 11.5%

The parent company recorded revenues of €64.1 million and net income of €149.7 million in first half 2001.

Media & Communications reported a revenue increase to "€12.4 billion, up 12.4% over the pro forma first half of 2000. Excluding Maroc Telecom and Universal Studios Group ('USG') Filmed Entertainment, revenue growth was 11%." Environnemental Services reported revenues of "€13.9 billion compared to €12.5 billion in the first half 2000, an 11.3% increase."

157. The July 23, 2001 6-K, the August 10, 2001 6-K, the September 25, 2001 6-K and the October 17, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing timely to write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the inflation of certain Canal+ assets. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not

misleading because Defendants failed to disclose that Vivendi was not adhering to the

"Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its

financial statements using accounting policies that violated GAAP.

158. On October 30, 2001, Vivendi issued a press release and filed a Form 6-K

(collectively, the "October 30, 2001 6-K") announcing its third quarter 2001 Media &

Communications results. The October 30, 2001 6-K announced that Media & Communications'

revenues were up 24 % to €7.3 billion, and that EBITDA was up 90% to €1.5 billion. This 6-K

further reported that Telecom's revenues increased by 17%, and EBITDA grew by 31% versus

pro forma results for the third quarter of 2000. Music EBITDA was €250 million for the quarter

ended September 30, 2001 and €702 million for the nine months ended September 30, 2001.

UMG reported a 6% increase in EBITDA to €250 million. The 6-K also stated in pertinent part:

> On a pro forma basis, third quarter revenue growth was 8%, and
> EBITDA growth was 30%. Year-to-date revenues increased 9%, and
> EBITDA increased 46%.

> Company reaffirms confidence in achieving its growth targets: 10%
> revenue growth and 35% organic EBITDA growth in 2001.

159. Messier was quoted in the October 30, 2001 6-K as follows:

> Our third quarter results for the media and communications
> businesses, with 24% revenue and 90% EBITDA growth, including
> organic growth of 8% and 36% respectively, are obviously strong
> despite the tough environment. . . . They reflect both our higher
> potential for growth and greater resiliency to recessionary
> environments compared to many of our peers.

> \* \* \*

> Additionally, Vivendi Universal's media and communications
> businesses are presently less vulnerable to recessionary environments
> than many of our peers because of our strong defensive qualities.

> \* \* \*