> Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers.
>
>                            \* \* \*
>
> An early look at the fourth quarter indicates that we are on track to meet our targets. I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base. This, combined with some expansions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media & Communications EBITDA slightly above 5 billion euros. (Footnotes omitted.)

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting improprieties discussed above in Section V.B, *supra*, and to Defendants' concealment of the liquidity crisis discussed above in Section V.C, *supra*.

160. Following the release of the October 30, 2001 6-K, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects. As reported in the complaint in the Securities Class Action, during the call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share;
>
> The Company was still on track to achieve strong growth in revenues and earnings in 2001.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that the Company was only able to achieve the results reported through the accounting improprieties discussed above in

Section V.B, *supra*, and through their concealment of the liquidity crisis the Company was facing, as discussed above in Section V.C, *supra*.

161. Based on Defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's reported financial results. For example, on October 31, 2001, ING Barings ("ING") issued a "Strong Buy" recommendation, stating:

> Vivendi . . . is one of the few media groups not to have issued a profit warning since the beginning of the year. Management has stressed its confidence once again and remains comfortable with the consensus forecasts.

162. On November 14, 2001, Vivendi Universal filed a Form 6-K (the "November 14, 2001 6-K") incorporating Messier's shareholder newsletter. Messier trumpeted Vivendi Universal's first-half 2001 earnings as "good" and stated that "we are in a position to confirm our annual targets with confidence despite the economic climate." He further stated:

> For the company as a whole, revenues are up 11%, generating a 42% increase in EBITDA to almost 4 billion euros. The Media & Communications businesses posted a 77% increase in EBITDA and a 184% increase in EBIT, while Environmenental Services businesses have continued to grow steadily in terms of both revenues (11%) and EBITDA (12%). Vivendi Universal's primary strength is its operational strength.

163. On December 6, 2001, Vivendi issued a press release and filed a Form 6-K announcing Edgar Bronfman, Jr.'s ("Bronfman") decision to resign from his position as Executive Vice Chairman of Vivendi. Bronfman remained as "Vice-Chairman of the Board and an advisor to the company." Commenting on Bronfman's resignation, Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading

because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a precarious financial position as a result of the accounting improprieties discussed above in Section V.B, *supra*, and was suffering from a liquidity crisis, as discussed above in Section V.C, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi's purportedly "solid performance" was attributable to the accounting improprieties discussed above in Section V.B, *supra*, and to Defendants' active concealment of the liquidity crisis the Company was facing, as discussed above in Section V.C, *supra*.

164. On December 11, 2001, Defendants caused Vivendi to file a Form 6-K (the "December 11, 2001 6-K") announcing the revenue figures filed with French authorities. In the Form 6-K, Vivendi announced:

> [T]he company's Media & Communications businesses reported pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros. Revenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago.

Messier further stated that he was "pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal+."

165. The October 30, 2001 6-K, the November 14, 2001 6-K and the December 11, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing to timely write down overvalued assets from previous corporate investments and

- 66 -

acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc

subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's

revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the

inflation of certain Canal+ assets. In addition, these statements contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading because Defendants failed to disclose that Vivendi was

suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would

necessarily need to restructure its debt obligations in order to remain solvent and avoid

bankruptcy. Further, these statements contained untrue statements of material fact and omitted

to state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi was not adhering to the "Significant

Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial

statements using accounting policies that violated GAAP.

166. In a December 13, 2001 press release, the Company announced that it had

"authorized Goldman Sachs and Deutsche Bank to carry out a [$1.5 billion] placement of BSkyB

share certificates that must be converted in October 2002." The press release went on to state:

> Following last week's sale of 9.3% of Vivendi Environnement and
> with this transaction, Vivendi Universal will then be in a position to
> cover any needs that may arise from various opportunities for
> strategic partnerships in the U.S. television and distribution segments.
> Such opportunities may or may not be taken up.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section

V.C, *supra*.

- 67 -

167. The next day, on December 14, 2001, the Financial Times (London) reported on the announced sale of Vivendi's $1.5 billion interest in BSkyB and the sale of a $1.06 billion interest in Vivendi Environnement. The article quoted Vivendi as stating that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section V.C, *supra*.

168. On December 17, 2001, Vivendi issued a press release in Paris and New York and filed a Form 6-K announcing the acquisition of USA Networks for $10.3 billion in combined stock and cash. The acquisition was financed by an exchange of securities and "limited" cash outlay by Vivendi. Commenting on the acquisition, Messier stated in pertinent part:

> Our strategy is clearly coming together. Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.
>
> * * *
>
> In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level – EBITDA, net income and free cash flow. By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.
>
> * * *
>
> At the end of just one year following our merger with Seagram and Canal+, we have put the pieces together in fulfilling our strategy. In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S. - and here we are today. We expect that 2002 will be a year of growth, without further change in perimeter.

- 68 -

Messier's statements contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that the Company was not "strongly positioned to enhance performance and

value to Vivendi Universal shareholders" but, rather, was in a precarious financial condition due

to the Defendants' concealment of Vivendi's liquidity crisis from the investing public.

169. On December 17, 2001, Messier held a press conference with Barry Diller,

Chairman and CEO of USA Network, from the St. Regis Hotel in New York City to discuss the

acquisition of USA Networks, the creation of Vivendi Universal Entertainment ("VUE"), and

Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on
> Vivendi Universal.  On the reverse, what it allows us to do is to
> increase our [EBITDA] target for 2002 by more than ten percent.  It's
> to increase our net income in 2002 by roughly 200 million dollars.
> It's to increase the net free cash flow of the group in 2002 by, let's
> say three hundred and fifty million dollars.  At every level of the
> [P&L] and of the cash flow that you may look at, this transaction is
> very positive to VUE shareholders year one.
>
> * * *
>
> As far as the global [debt] ratio of the group is concerned, our target
> is to have in '02 a debt to [EBITDA] ratio well below three times and
> especially we are focusing to reach that target ahead of the end of the
> first half of 2002, which means that Vivendi Universal will end up its
> program of selling its non core asset in the first half of '02; it will
> give us very comfortable triple B credit rating targets that we are very
> comfortable with. . . . So, no cleaning of balance sheet because the
> balance sheet is clean. . . .  [W]e are committed to issue full U.S.
> [GAAP] earnings starting Q1 of '02.  We already, in fact, worked on
> the basis of U.S. [GAAP] accounting methods in '01 in order to build
> our track record at the time of this year, at the time of the release of
> our first full quarterly U.S. [GAAP] in '02.  So we are already
> applying all U.S. [GAAP] methodologies, including those relating to
> amortization.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Messier

failed to disclose that Vivendi was not applying "U.S. [GAAP] methodologies" but, rather, was engaging in accounting improprieties as discussed above in Section V.B, *supra*.

170. As the plaintiffs in the Securities Class Action alleged, on February 6, 2002, AFX News Limited reported that in an attempt to dispel concern about the Company's debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company will not make any change in its guidance for 2001 earnings due for release on March 5, although the fourth quarter was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff, addressing the recent volatility and losses in the company's share price...
>
> "Some global markets, including the music market, declined during this period. But despite the difficulties, we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation," said Messier.
>
> "There are no hidden risks and no speculative instruments," he said.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting improprieties and liquidity crisis discussed above at Sections V.B and V.C, *supra*.

171. On February 11, 2002, Vivendi issued a press release (the "February 11, 2002 Press Release") announcing its year-end 2001 Media & Communications results. Vivendi announced Media & Communications "pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros." The release further reported that Vivendi's Telecom segment achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago."

172. Commenting on the results, Messier stated:

> I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal+. Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal. Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year. Our 2001 results give us confidence that we can achieve our growth targets again in 2002.

173. The February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts; and (d) failing to follow its own accounting policies. In addition, the February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

174. On March 4, 2002, Messier was quoted in the Financial Times as stating that Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: "There are no hidden risks and no speculative instruments." Messier's statements contained untrue statements of material fact and omitted to

- 71 -

state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting improprieties and liquidity crisis discussed above at Sections V.B and V.C, *supra*.

175. On March 5, 2002, Vivendi issued a press release and filed a Form 6-K (collectively, the "March 5, 2002 6-K") proclaiming its year-end 2001 results. Vivendi announced that revenues of €57.360 reflected a 10% increase and that operating income of €3.795 billion reflected a 47% increase, on a pro forma basis.

176. The March 5, 2002 6-K included financial information by business segment. The release further reported Media & Communications revenues of €28.115 billion, representing 10% pro forma revenue growth; EBITDA of €5.036 billion, representing 34% pro forma EBITDA growth; and operating income of €1.838 billion, representing 89% pro forma growth. In addition, Telecom's pro forma revenue was up 24% to €8 billion and its EBITDA increased 49% to €2.5 billion. Further, the March 5, 2002 Form 6-K listed Telecom EBITDA of €2.3 billion as 46% of Media & Communications EBITDA of €5 billion. Telecom's operating income was €1.3 billion, which was 72% of Media & Communications' operating income of €1.8 billion. The Telecom pro forma EBITDA was reported as growing by 49%, with Maroc Telecom reporting a pro forma EBITDA gain of 33%. EBITDA was discussed as follows:

> EBITDA consists of operating income before depreciation, amortization (including film amortization at CANAL+ Group and book plate amortization at VUP), restructuring charges and other one-time items (principally reorganization costs at CANAL+ Group), and does not reflect adjustment for any minority interests in fully consolidated subsidiaries. EBITDA is presented and discussed because Vivendi Universal management considers it an important indicator of the operational strength and performance of its Media & Communications businesses, including the ability to provide cash flows to service debt and fund capital expenditures.

* * *

> U.S. GAAP requires consolidation by whatever company manages the assets, controls the board of directors and possesses majority voting control. VU is required under U.S. (and French) GAAP to consolidate Cegetel and Maroc Telecom since they meet these criteria.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the consolidation of Cegetel and Maroc Telecom was not "required" under U.S. GAAP but, rather, violated GAAP as set forth above in Section V.B, *supra*.

177. In discussing off balance sheet transactions, Vivendi stated that there were "no off-balance sheet loans that have not been disclosed or any such items that would create accounting benefits" and that Vivendi regards "cash as king." Vivendi attached a document to its March 5, 2002 Form 6-K that would "provide full disclosure of our off balance sheet financing as well as other matters" for the Media & Communications division. Here, Vivendi stated that "[p]hilosphically, VU prefers to keep its obligations on the balance sheet." Only two off-balance sheet financing vehicles were reported: "two qualifying special purpose entities associated with the sale of 400 million BSkyB shares." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi failed to disclose the existence of two significant obligations—the Cegetel current account and the Maroc Telecom side agreement, as set forth above in Section V.C.5, *supra*.

178. Vivendi also reported a charge for impairment to goodwill under French GAAP of €12.6 billion, including €6 billion for Canal Plus. Debt in French GAAP was listed as €14.6 billion for the Media & Communications activities; under U.S. GAAP, debt was €19.1 billion. The release also stated in part:

> After having been the only large media company not to modify any of its guidance for the year 2001, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow.  For 2002, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media & Communications businesses.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants—despite their alleged "confidence" in the strength of Vivendi's business—were concealing both the accounting improprieties discussed above in Section V.B, *supra*, and the liquidity crisis discussed above in Section V.C, *supra*.

179. The March 5, 2002 6-K also touted the Company's "Operating Free Cash Flow" as being "ahead of guidance" and announced Media & Communications operating free cash flow of €2.026 billion, "up 2 billion euros over 2000."  Commenting on the results, Messier stated in part as follows:

> I am very pleased with the excellent operating results that have been achieved.  These results confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment.
>
> Most of our businesses improved market share, EBITDA and free cash flow during this period of global economic slowing.  Even more important, those operational performances are showing improvement at every level of our P&L.  The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA translating in incremental EBIT, is a strong and positive sign.  The improvement of operational free cash-flow (FCF) at a higher rate than EBITDA indicates the clear focus given in 2001 to cash management.  We will continue this effort.
>
> * * *
>
> We stay fully committed to conveying full transparency in our financial results.  Vivendi Universal is not only transparent but is the only media and communications company not to change its numbers and targets, it underscores its commitment to accurate, conservative and consistent reporting in every area of its operations.

- 74 -

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the reasons stated but, rather, to the accounting improprieties discussed above in Section V.B, *supra*, and their active concealment of the liquidity crisis discussed above in Section V.C, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing fraudulent accounting to burnish the Company's actual performance, as discussed above in Section V.B, *supra*.

180. The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section V.C above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

- 75 -

181. On March 5, 2002, during an investor conference call, Messier discussed the

Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted to minimize

the importance of the $12.6 billion write down in goodwill as follows:

> I just want to say a very quick points before going to your questions.
> And I - the first point here based on the fact that we experienced
> excellent operating results in the '01 and obviously that's very
> fortunate because this excellent operating results in '01 are also in the
> captive of the future and then we'll drive our future. I think that we
> build our operational reserve but what I want to point out is that if we
> continue or renewed on the EBITDA growth target results and add to
> our main in the quarter'01. We did all of this. Our operating pre
> cash flow target, we average Euro 2 million instead of the guidance
> of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you
> go to cash the more we over this -- the guidance that we gave to the
> market is a strong sign of the quality of the casual management in
> working above the requirements and CAPEX management in'01.
> That goes to the same direction is that we did overcome largely all
> targets in terms of cash service. We save Euro 200 million EBITDA,
> we reach 300 EBITDA 100 more, and close to Euro 600 million total
> cash savings. The operations and these business achievements, I
> think that we owed them to our competitive advantages that were
> evident in'01. That: (1) the excellent quality of management; (2) the
> fact that we gain market share in about every single of our business.
> Those gains of market shares coming from [scale and scope]; (3) the
> assets mix, maximize our ability to go to digitalization for delivery on
> the mobile devices; and (4) to our global footprint minimizes of
> earnings volatility. That's the business achievement.

Messier also attempted to downplay the impairment charges as a choice of switching from French

GAAP to U.S. GAAP in order "to be even more transparent." Messier stressed the non-cash

nature of the impairment charge.

182. As reported in the Securities Class Action Complaint, Lehman Brothers issued a

report on March 6, 2002 based, in part, on the statements made by Vivendi's management in the

March 5, 2002 conference call:

> In its post results conference call, management confirmed that the
> value adjustments to the U.S. assets . . . reflected largely a change in
> accounting treatment and did not signal a negative outlook for the
> U.S. water business.

- 76 -

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the goodwill write-down was not attributable to a change in accounting but, rather, to the fact that the Company had been overstating goodwill all along, as set forth above in Section V.B.3, *supra*.

183. Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002 conference call, stating in pertinent part as follows:

> For '02, Management reiterated their guidance of 10% organic sales growth for all the Media Communications businesses. Vivendi also expects EBITDA of close to €6 billion (pre-USA Networks and pre-Stream). . . .
>
> A list of ten accounting 'issues' relating to off-balance sheet financing was published in conjunction with the results and the group is today holding an accounting workshop to clarify the impact of moving to U.S. GAAP when it reports Q1'02 results this year.
>
> * * *
>
> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

The statements made by Vivendi management contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that they expected to reach the reported goals by employing fraudulent accounting, as discussed above in Section V.B, *supra*, and by continuing to conceal to Company's liquidity crisis, as discussed above in Section V.C, *supra*.

184. On April 4, 2002, Messier filed another shareholder newsletter on Form 6-K (the April 4, 2002 6-K"). In it, he confirmed that "Vivendi Universal has met its targets in 2001." He went on to state:

Our media and communications businesses posted EBITDA . . . of 5 billion euros (a 34% pro forma growth), and operating income of 1.8 billion euros (an 89% pro forma growth) and operating free cash flow of 2 billion euros, which is above projections. These results were achieved with a 10% pro forma revenue growth to 28.9 billion euros. If we include our subsidiary Vivendi Environnement, total pro forma revenues amount to 58.2 billion euros.

Our business in media and communications have improved their performance, with strong EBITDA growth for Cegetel, TV and Film . . ., and Vivendi Universal Publishing. . . .

Achieving these results during the general economic downturn of recent months was no easy task. But it is in tough situations like this that we can demonstrate our capacity. The proof is there, thanks to the quality of our teams and our products.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was able to meet its target and posts the results reported only by employing fraudulent accounting, as discussed above in Section V.B, *supra*, and by continuing to conceal to Company's liquidity crisis, as discussed above in Section V.C, *supra*.

185. When addressing the reported accounting losses of €13.6 billion, Messier pointed out that "this loss results from a write-down of the value of certain assets taken purely for accounting purposes. There is no actual cash disbursement." He went on to blame the losses on "our anticipated application of U.S. GAAP," stating:

The change involves several technical modifications, the most significant being the re-evaluation of acquired assets at current market values. Taking into account the stock market decline, the following companies have been reduced on our balance sheet. The value of Canal+ is reduced by 6 billion euros, that of Universal Music by 3.1 billion euros, and the value of USG (studios) and Vivendi Telecom International by 1.3 billion euros each. I would like to repeat this move does not represent any operating loss – it is an accounting loss that has no cash impact whatsoever.

By making this adjustment now in our financial statements . . . we are keeping one step ahead of market expectations. We are also giving

ourselves the opportunity to present first quarter 2002 figures that are understandable to all investors.

This will also enable us, in the future, to improve our net income by significantly reducing charges relating to amortization.

These factors allow us to propose to the shareholders' meeting that the dividend for 2001 be maintained at 1 euro per share.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the goodwill write-down was not attributable to a change in accounting but, rather, to the fact that the Company had been overstating goodwill all along, as set forth above in Section V.B.3, *supra*.

186. On April 15, 2002, Defendants caused Vivendi to file a Form 6-K (the "April 15, 2002 6-K") containing a translation of financial information provided to the French financial regulators. In discussing the goodwill impairment of Vivendi's assets, the Form 6-K stated:

Vivendi Universal reviews the carrying of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable. Measurement of any impairment is based on fair value. In 2001, following the recent market decline, . . . our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest related to Vivendi Environnement). The charge was comprised of €6 billion for CANAL+ Group, €3.1 billion for Universal Music Group, €1.3 billion for Universal Studios Group, €1.3 billion for international Telecoms businesses, €0.6 billion for Vivendi Environnement (net of €0.3 billion minority interest) and €0.3 billion for Internet businesses. Of the total charge, €12.1 billion related to consolidated subsidiaries and €0.8 billion related to investments accounted for using the equity method.

187. The financial statements contained in the April 15, 2002 6-K indicated that "[t]otal revenues were €57.4 billion." The revenues generated by Vivendi's "core businesses" were €57.2 billion, which was an increase of 43%. Twenty-seven percent of the revenues was due to

- 79 -

the "inclusion of a full twelve-month results of the acquired Seagram's operations in 2001 . . .

4% resulted from the 2001 acquisitions of Maroc Telecom, Houghton Mifflin and MP3.com, and

the remaining 12% was generated by a combination of organic growth and the impact of less

significant acquisitions and disposals." The April 15, 2002 6-K further stated:

> Revenues generated by our Media & Communications businesses
> increased 107% to €28.1 billion, accounting for 49% of our total
> revenues compared to 33% in 2000. . . . On a pro forma basis, which
> includes twelve months of comparable operations both for Seagram
> and the above 2001 acquisitions, revenues increased 9% to €28.9
> billion (10% excluding Universal Studios Group filmed
> entertainment). Double-digit revenue growth of 24% and 36%
> respectively, were generated by our Telecom and Internet businesses.
> Our TV & Film and Publishing businesses generated revenue growth
> of 8% and 5%, respectively. In our Music business, revenues
> declined 1%, however, this was a strong performance in a down
> market.
>
> Revenues generated by our Environmental Services businesses, at
> €29.1 billion, increased 11%, 8% of which was generated by organic
> growth and 3% of which was due to the implementation of the
> Dalkia-EDF agreement and other acquisitions. . . .

* * *

. . . In the U.S., revenues increased 81% to €12.7 billion.

188. In discussing Vivendi's operating income, the April 15, 2002 6-K noted that

operating income had "more than" doubled to €3.8 billion, an increase of 145% in Vivendi's

"core businesses." The Media & Communications businesses generated €2.2 billion in operating

income "before holding and corporate expenses." The 2001 €2.2 billion operating income was

an extraordinary increase from €174 million in 2000. Environmental Services' operating

income increased 24% to €2 billion.

189. On April 24, 2002, Vivendi filed a Form 6-K (the "April 24, 2002 6-K") announcing

its "strong" first quarter 2002 Media & Communications results. Vivendi reported a "strong

surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."

The release, issued in New York and filed on a Form 6-K, further reported that "[n]et debt fell

from approximately 19 billion euros to approximately 17 billion euros." The release also

reported Media & Communications' "revenue organic growth of 13% to 6.8 billion euros; strong

EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408

million euros." Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter. In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.
>
>                         \* \* \*
>
> In a difficult environment, Vivendi Universal's businesses gained market share. Cash management improved dramatically. Finally, the revenue and cost synergies achieved in the quarter were significant. Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal+ and Internet operations.

190. On April 30, 2002, Vivendi filed a Form 6-K (the "April 30, 2002 6-K") announcing

purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma

consolidated revenue to €13.2 billion. The release, issued in New York and filed on a Form 6-K,

also reported that consolidated operating income grew 11% pro forma to €781 million, excluding

goodwill amortization. In the release, Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders. In the first quarter of 2002, both Media & Communications and Vivendi Environnement delivered their targets.
>
> The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of

> Media & Communications year-end Debt/EBITDA ratio to less than
> 3x by December 31, 2002.
>
> In a very difficult economic environment, characterized by many
> market uncertainties, Vivendi Universal's global businesses gained
> market share. In addition, strong improvement was achieved in cash
> management, debt reduction, synergies, management development
> and revenue growth.

191. The April 30, 2002 6-K further touted the Company's allegedly

strong cash flow position:

> On a pro forma basis, excluding Vivendi Universal's publishing
> businesses to be disposed of (including the B-to-B and Health
> businesses whose sale is expected to be completed in the second
> quarter), Media & Communications reported:
>
> A strong surge of operational free cash flow, up 159% to 1.4 billion
> euros, well ahead of expectations;
>
> Strong operating results in the first quarter: revenue organic growth
> of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion
> euros; and solid operating income growth, up 37% to 408 million
> euros. All were significantly ahead of budget.

192. The April 4, 2002 6-K, the April 15, 2002 6-K, the April 24, 2002 6-K and the April

30, 2002 60K contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because, *inter alia*,

the Company was engaged in improper accounting practices that had the effect of materially

overstating Vivendi's reported earnings (as particularized in Section V.B above), including: (a)

failing to timely write down overvalued assets from previous corporate investments and

acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc

Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating

the Company's revenue from certain multi-year contracts. In addition, these statements

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading because Defendants failed to disclose

that the Company was suffering from a liquidity crisis (as particularized in Section V.C above)

and that Vivendi would need to restructure its debt obligations in order to remain solvent and

avoid bankruptcy.

193. On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3 --

the lowest investment guide. According to Moody's, the ratings downgrade reflected Moody's

concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as

planned."

194. That same day, Vivendi issued a press release, filed on a Form 6-K, criticizing

Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into
> consideration the currently poor market conditions and the fact that
> the agency does not take into account immediately the whole of the
> debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines. In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> meet its operating targets for 2002, as proved by its first-quarter
> results. The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi's "confidence" in its ability to meet its targets for 2002 was based

on the accounting improprieties discussed above in Section V.B, *supra*, and on their continued

concealment of the Company's burgeoning liquidity crisis discussed above in Section V.C,

*supra*.

- 83 -

195. On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December 31, 2001 (the "2001 Form 20-F"). The 2001 Form 20-F reported total revenues of €57.4 billion in 2001, which was an increase of 43% over 2000. Vivendi's Media & Communications business's revenues increased 107% to €28.1 billion over 2000, accounting for 49% of its total revenues. The Environmental Services businesses generated €29.1 billion, an increase of 11% over 2000. In discussing 2001 financial results versus the 2000 results, Vivendi reported that "EBITDA more than doubled to €2.3 billion and operating income almost tripled to €1.3 billion." Excluding Maroc Telecom's results, "revenue growth was 26%, EBITDA increased 56% and operating income increased 103%." In discussing 2000 financial results versus 1999 results, Defendants reported that "EBITDA grew 164% to €1.3 billion and operating income of €486 million was earned compared to an operating loss of €60 million."

196. According to the 2001 Form 20-F, Vivendi's total operating income "more than doubled to €3.8 billion." The Media & Communications businesses "generated operating income before holding and corporate expenses of €2.2 billion in 2001." Environmental Services' operating income increased 24% to €2 billion.

197. Vivendi listed its liquidity and capital resources at December 31, 2001 as follows:

> €41.8 billion of debt, €4.7 billion of cash and cash equivalents and €36.7 billion of shareholders equity compared to €38.8 billion of debt, €3.3 billion of cash and equivalents and €65.7 billion of shareholders equity at December 31, 2000.

198. The Consolidated Balance Sheet listed cash at €4.7 billion and €3.2 billion as of December 31, 2001 and December 31, 2000, respectively. Net cash provided by operating activities was presented in the Consolidated Statement of Cash Flows as being €4.5 billion and €2.5 billion as of December 31, 2001 and December 31, 2000, respectively.

199. In discussing goodwill, Defendants stated:

- 84 -

Recurring goodwill amortization increased to almost €1.7 billion, primarily due to the inclusion of a full twelve-months of goodwill amortization related to the merger with Seagram and Canal Plus. Additionally, as previously discussed, our 2001 annual review for impairment of the carrying value of long lived-assets resulted in a non-recurring, non-cash charge of €12.9 billion to goodwill amortization. The impact of the charge on future results will be to reduce goodwill amortization by approximately €380 million per year.

200. Defendants also reported cash flow in the 2001 Form 20-F as follows:

Net Cash Flow from Operating Activities -- Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecom, Publishing and Environmental Services businesses.

Net Cash Flow from Investing Activities -- Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

Net Cash Flow from Financing Activities -- In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €59 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term

borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €03.8 billion.

201. In discussing the Maroc and Cegetel consolidation in Footnote 11 to the

Consolidated Financial Statements, Defendants reported:

> [Cegetel and Maroc are] consolidated because, through a shareholders' agreement, Vivendi Universal has a majority of the shareholder voting rights and no other shareholder or groups of shareholders exercise substantive participating rights, which would allow them to veto or block decisions taken by Vivendi Universal.

202. In reporting on its investment into Elektrim SA, Defendants disclosed only that

Vivendi had entered into an Investment Agreement with Elektrim SA, acquiring 49% of

Elektrim. It further stated:

> In March 2002, Vivendi Universal announced that it had signed a non-binding Memorandum of Understanding with a group financial investors led by Citigroup Investments to sell its 49% interest in Elektrim Telekomunikacja. As part of the agreement, Vivendi Universal will retain a minority interest in the Citigroup-led consortium and will be granted a put option and the investors a call option on this interest. The exercise of the two options will ensure that Vivendi Universal is able to completely withdraw from its investment in Elektrim Telekomunikacja in due course

203. In discussing Vivendi's accounting policies, Defendants again stated that Vivendi

recognized revenues from the sale of recorded music, "net of a provision for estimated returns

and allowances, . . . upon shipment to third parties" and recognized revenues in Environnemental

Services when services were provided, stating:

> Amounts billed and collected prior to services being performed are included in deferred revenues. Fees incurred to obtain a contract and

> paid upfront are capitalized and amortized on a straight-line basis
> over the duration of the contract. Revenues from long-term contracts
> involving a substantial construction component are recorded on the
> percentage-of-completion basis.

204. For the reasons set forth in greater detail in Section V.B, *supra*, Vivendi's historical

financial statements and balance sheets contained in Vivendi's 2001 Form 20-F contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, the Company (a) failed to report

pro forma financial results properly, improperly consolidated into its financials revenue from its

Cegetel subsidiary (in which the Company had less than 50% ownership), (b) failed timely to

write down impaired goodwill from previous corporate investments and acquisitions, including

Canal+,(c) overstated the Company's revenue from its Environnemental division on certain

multi-year contracts in violation of GAAP and (d) failed to adhere to the accounting policies

described in its SEC filings.  In addition, the 2001 Form 20-F contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading because Defendants failed to disclose that Vivendi was

suffering from a liquidity crisis, as set forth above at Section V.C.

205. Defendants further attempted to address concerns about debt levels by issuing a

press release on May 30, 2002, subsequently filed on a Form 6-K (collectively, the "May 30,

2002 6-K").  The May 30, 2002 6-K disclosed that Vivendi had negotiated some debt relief by

obtaining an "agreement from the banks to delete the clauses that linked the availability of credit

lines to a rating level."  This action decoupled Vivendi's bank credit lines from rating agencies'

decisions.  Investors were further reassured that "the Company has no reason to anticipate or fear

any further deterioration in its credit rating."  The May 30, 2002 6-K further stated:

> Vivendi Universal has also confirmed that, after payment of the
> dividend and the acquisition of USA Networks, its available credit

> lines that have not been used to date amount to almost 3.5 billion
> euros. Also, its use of commercial paper is limited to about 1 billion
> euros, and the reimbursement of expected debts during the coming
> months is limited.
>
> This cash situation, which, the Company believes, is comfortable –
> even assuming an extremely pessimistic market – will enable the
> Company to continue its debt reduction program with confidence and
> with a view to creating the best possible value for its shareholders.

206. The May 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was facing a liquidity crisis, as discussed above in Section V.C. Unbeknownst to investors, Vivendi's cash situation was dire and a further deterioration in its credit rating was all but certain. Defendants were offering false reassurances that had their intended effect – on May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

207. On June 11, 2002, Defendants caused Vivendi to file a Form 6-K (the "June 11, 2002 6-K") containing Vivendi's first quarter 2002 unaudited consolidated financial results reporting numbers in line with its April 30, 2002 6-K, discussed above at paragraph 190.

208. The statements contained in the June 11, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading for the same reasons the statements in the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, discussed above at paragraph 192.

209. Defendants continued their efforts to counteract the stream of bad news. On June 25, 2002, Vivendi issued a press release (and filed a Form 6-K) (collectively, the "June 25, 2002 6-K") titled "Vivendi Universal to Lower Debt by €4 billion in 2002," reiterating the positive steps it had taken to reduce debt and announcing that the Company's cash position was not precarious.

210. The statement in the June 25, 20-2 6-K that the Company's cash position was not precarious contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth above at Section V.C.

211. On June 26, 2002, Vivendi issued yet another press release and Form 6-K (collectively, the "June 26, 2002 6-K") outlining additional details about Vivendi's "deleveraging and liquidity." The June 26, 2002 6-K first outlined that "[a]ccording to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.9 billion under French GAAP)." The June 26, 2002 6-K stated that "[t]he main factors that will impact debt under U.S. practices in the second quarter were or will be [cash inflows and cash outflows]."

212. Further, the June 26, 2002 6-K stated that Vivendi's new debt target was €15 billion by December 31, 2002, stating that "[t]his target represents a ratio of debt to estimated 2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both U.S. and French accounting standards. Using 'proportional' levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA." According to the press release, the lowered debt target, "which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year."

213. The June 26, 2002 6-K also lauded Vivendi's high levels of available credit, stating that "[a]t this point in time, Vivendi Universal has available around €3.3 billion in unused credit

lines. This is available to back up its commercial paper outstanding of nearly €1 billion." This 6-K extolled Vivendi's strong free cash flow, stating:

> Owing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months.

214. According to the June 26, 2002 6-K, to aid its cash situation, Vivendi had also "renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below [a certain level]."

215. The June 26, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as discussed above in Section V.C.

216. On June 26, 2002, Messier discussed the Company's debt and liquidity during an investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. The best that we can do is to show you that's [sic] there is no hidden liability that's you have all the information to come back.

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above at Section V.B, *supra*, and that it was facing a liquidity crisis, as discussed above at Section V.C, *supra*.

217. As stated in the Securities Class Action Complaint, on June 26, 2002 the Dow Jones International News reported:

> Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price.
>
> Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, "we feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above at Section V.B, *supra*, and that it was facing a liquidity crisis, as discussed above at Section V.C, *supra*.

218. On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default. On July 2, 2002, Bloomberg reported that Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting." Messier's statement that there were no hidden risks in the company's accounting contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above at Section V.B, *supra*, and that it was facing a liquidity crisis, as discussed above at Section V.C, *supra*.

219. The next day, July 3, 2002, as reported in The Columbian, Messier continued to defend Vivendi's financial statements: "There are no underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true, genuine and complete."

220. Messier's contention that the Company's results were "true, genuine and complete" contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading because he failed to disclose that

Vivendi was engaging in a fraudulent accounting scheme, as discussed above at Section V.B,

*supra*, and that it was facing a liquidity crisis, as discussed above at Section V.C, *supra*.

## VII.   THE TRUTH EMERGES, CAUSING PLAINTIFF TO INCUR LOSSES

221. Despite Defendants' attempts to reassure the market that the Company's financial

house was in good order, Moody's lowered the Company's long-term debt rating to Baa3 on

May 3, 2002, putting the securities just one notch above the "junk" status assigned to speculative

investments.  Moody's expressly attributed this ratings drop to concerns that the Company might

not be able to reduce its debt load as quickly and comprehensively as it had planned.  Vivendi

promptly retaliated, issuing a same-day press release that attacked Moody's downgrade on the

grounds that it purportedly did not consider poor market conditions or the full extent of

Vivendi's debt reduction program.  Further, in its Form 6-K issued that same day, Vivendi

attempted to assure the market that Moody's downgrade would not adversely affect the

Company, stating:

> This decision has no impact on Vivendi Universal's cash situation.  It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines.  In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> *meet its operating targets* for 2002, as proved by *its* first-quarter
> results. The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

Despite Defendants' attempt to reassure the market, Vivendi's ADSs dropped $1.74, from

$30.76 to $29.07, in response to Moody's rating downgrade.  The Company's common shares

suffered similar declines, dropping from €33.77 to €31.52.

- 92 -

222. Once the market learned of the potentially catastrophic effects of subsequent credit downgrades, Vivendi's stock plunged lower still.  Notably, following May 6, 2002 press accounts revealing that Vivendi could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip any further, the Company's ADSs dropped another $0.81 to $28.26, while its common shares dropped another €0.52 to €31.

223. As the Company's stock continued to plummet, investors called for Messier's head. During a May 29, 2002 meeting in New York, Vivendi's board voted to require a governance committee—led by former Seagrams owner Edgar Bronfman, Jr.—to oversee Messier's leadership.

224. By May 29, 2002, with Vivendi's ADSs now trading in the $29 to $30 range and its ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels, Defendants sought to reassure the financial markets by issuing a press release (also filed on a Form 6-K) reflecting a May 29, 2002 board meeting.  The press release stated that Vivendi's board had "carried out a detailed examination of Vivendi Universal's operating and financial targets for 2002."  According to the press release, the board stated that their strategy was "based on the active continuation of the debt reduction program and the internal growth of the company's businesses."  Messier was quoted as follows:

> Our Board of Directors and management are proceeding together, deliberately and decisively, to execute a plan that, in meeting our financial targets and operating objectives, will deliver increased value and solid growth to our Company. I look forward to the recommendations of our newly created governance committee, which, I believe, will have an added contribution by continuing to improve the structures and procedures that insure an absolute and impartial focus on the Board's fiduciary duty to stakeholders.

225. While the Company sought to assure investors that it was not facing a liquidity crisis, rumors that Vivendi was in danger of default on its credit facilities persisted.  On July 2,

2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's

ADSs to plummet nearly 21%, falling from $22.45 to $17.76, while its common shares fell more

than 25%, from €23.90 to €17.80. In fact, the Company's shares plunged so fast that the Paris

Bourse repeatedly suspended trading in the embattled conglomerate's common shares.

226. Vivendi swiftly ousted Messier the following day, admitting that the Company was

facing a "short-term liquidity issue." Vivendi disclosed that it would be required to repay

creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for

renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7

billion by the end of 2002—an amount they feared could expand to €5.5 billion by the middle of

2003 if the Company failed quickly to secure new multibillion-euro lines of credit. These

announcements caused the Company's ADSs and common shares to fall even further, dropping

nearly another 12% on July 3, 2002 from $17.76 to $15.66 and nearly another 22% from €17.80

to €13.90, respectively. All told, the Company's ADSs and common shares fell a stunning 30%

and 41.8%, respectively, in the two days following the second credit rating downgrade.

227. On July 5, 2002, The Globe and Mail Metro, a Canadian newspaper, reported that

Vivendi "finally admitted what its ousted chairman and chief executive officer, Jean-Marie

Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in

danger of a cash crunch." The Globe and Mail Metro further stated:

> Based on a detailed liquidity statement Vivendi put out late
> Wednesday, credit analysts estimate that Vivendi could face a cash
> shortfall of 2.7 billion euros ($2.64 billion U.S.) by the end of the
> year, expanding to as much as 5.5 billion euros by the middle of
> 2003, unless it can quickly secure a new multibillion-euro credit line
> from its lenders.
>
> * * *
>
> In its statement, Vivendi said it must repay 1.8 billion euros this
> month and said the payment would be financed from 2.4 billion euros

> in existing cash and credit lines. It also has a 3.8-billion-euro credit
> line that will roll over this month unless the banks determine there
> has been a "material adverse change" with the company.
>
> This grim outlook contrasts with Mr. Messier's recent assurance that
> the "treasury situation" at Vivendi--owner of Universal Studios,
> Universal Music Group, USA Networks and minority stakes in a host
> of other assets-was "comfortable even in the most pessimistic market
> hypotheses."

228. On July 10, 2002, The Wall Street Journal reported that the COB had raided

Vivendi's Paris headquarters as part of a formal investigation into the Company's financial

disclosures going back to 2001. The French investigation had been opened to look into alleged

"publication of false balance sheets for the tax years closing December 31, 2001 and December

31, 2002" and the publication of false and misleading information concerning the Company's

financial outlook for those years.

229. On July 16, 2002, Vivendi announced that Hannezo was relieved of his CFO duties

at Vivendi and would stay with Vivendi for six months as an advisor to the new chairman. A

July 17, 2002 research report by BNP Paribas Equities stated:

> This is no surprise. Guillaume Hannezo was very close to Jean-Marie
> Messier. *The group's financing packages and strategy were as much
> his as Messier's*.

(emphasis added).

230. Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only

foreshadowed drops still to come.

231. On August 14, 2002, the Company's new management held a conference call and

issued three press releases (filed with the SEC on Forms 6-K) informing the public of just how

dire Vivendi's financial situation had become.

232. The first press release memorialized the August 14 conference call. In it, Fourtou

stated that:

- 95 -

In the short term, due to the structure of our debt, we are facing a
liquidity problem . . . in spite of the value of our assets. That's why
the first thing I did upon my arrival was to negotiate . . . a new bank
facility of 1 billion euros. This new money has not yet been used. As
announced in July, we are presently negotiating a new facility of 3
billion euros which will include the first 1 billion euros. We have
reached a framework for agreement with the same seven banks and
we expect this new facility to be signed by the end of August. This
will allow Vivendi to buy the time necessary to implement the best
conditions for the necessary sale of the businesses. . . .

233. The second August 14 press release reported on the August 13, 2002 Board meeting,

announcing that the Board had, among other things, approved a plan to dispose of at least €10

billion worth of assets, including €5 billion in the next nine months; voted to sell Houghton

Mifflin; and authorized the cancellation of 20,865,167 treasury shares linked to certain stock

option plans.

234. The final August 14 press release and Form 6-K announced Vivendi's results for the

first half of 2002, reporting that "[n]et income was a loss of 12.3 billion euros, representing

negative 11.32 euros per basic share, for the first half of 2002." Further, the press release

highlighted the €11 billion goodwill impairment charge and the "financial provisions of 3.4

billion euros" that were recorded at June 30, 2002. Net income was negative €66 million, "or

negative 0.06 euros per basic share in the first half of 2002 compared with positive 0.27 euros

earnings per basic share in the 2001 period." Debt under French GAAP was approximately €35

billion. The Board also laid out its commitment to "raising at least 10 billion euros through asset

sales during the next two years, 5 billion euros of which will be completed during the next 9

months."

235. Reaction was swift and severe. Debt-rating agency Standard & Poor's slashed

Vivendi's long-term corporate credit that same day and warned of a further downgrade if

Vivendi could not secure new funding within a month. Fourtou was quoted by the Associated

Press on August 14, 2002 as stating: "We are facing a liquidity problem, [and I will] try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered." The news report also stated:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin. Adding insult to injury, a ratings agency downgraded the company's debt to junk.

> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions. In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.

236. In response to these further stunning developments, on August 14, 2002, Vivendi common shares closed at €11.89, down more than €4 (or approximately 25%) from their close the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

237. In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets. Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position. To clean up the mess Messier's costly acquisitions had made of the Company's finances, Vivendi announced an ambitious plan to shed €16 billion in assets between July 2002 and the end of 2004. Vivendi's "garage sale" included the following dispositions:

| Date | Disposition | Price |
|---|---|---|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |

| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal+ Technologies | €191 million |
| April 2003 | Telepiù | €831 million |
| May 2003 | Fixed-line telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal+ Nordic | €48 million |
| February 2004 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | € 169 million |
| June 2004 | Egée and Cédre Towers | €84 million |

| August 2004 | Interests in VIVA Media | €47 million |
| September 2004 | Canal+ Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

In sum, Vivendi dumped over €15 billion in assets between July 2002 and December 2004.

238. Unfortunately for Vivendi, however, its woes were not limited to its bloated balance sheet. On October 30, 2002, Vivendi announced that Paris's public prosecutor's office had opened an investigation into the veracity of the Company's financial disclosures. A few days later, the Company announced that a separate investigation had been opened on the other side of the Atlantic by the United State Attorney's Office for the Southern District of New York. The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

239. The SEC turned up the heat on November 20, 2002, announcing that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation. The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures. In connection with these enforcement efforts, the SEC in September 2003 obtained a court order forcing Vivendi to place in escrow $23 million it had earmarked to pay a severance package Messier negotiated just before his ouster. Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State Court concerning this severance package.

240. On September 15, 2003, the COB—following a fourteen month investigation— announced its conclusion that Vivendi had made false financial disclosures. Among its failures,

the COB found that Vivendi had not disclosed to investors the growing cash problems it faced during the end of Messier's tenure.

241. The United States-based investigations into the crisis engendered by Messier's more than $75 billion acquisition spree came to a stunning conclusion on December 24, 2003. That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million. The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002. Specially, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel and Maroc Telecom.

242. In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal securities laws and barring them from service as officers or directors of any public companies for respective ten and five year periods.

243. Subsequently, the SEC on April 14, 2004 issued an order instituting and simultaneously settling administrative cease and desist proceedings against John Luczycki, Vivendi's former Chief Accounting Officer and Controller. The SEC found that Luczycki had willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, ordering him to cease and desist from violating the antifraud provisions of the federal securities laws and prohibiting him from practicing as an accountant before the SEC for at least three years.

244. While French regulators were slower to bring the Vivendi debacle to a conclusion, it imposed fines of €1 billion each on the Company and Messier on December 8, 2004—marking only the second time the Autorite des marches financiers ("AMF") had come this close to meeting its €1.5 million fine cap.

245. On January 18, 2006, the Company announced plans to discontinue its ADS program, citing concerns over the costs of complying with United States disclosure requirements.

246. In the end, Messier's $75 billion + acquisition spree wreaked havoc on the Company, causing investors in the Company's ADSs to suffer a staggering 85% decline from their Loss Period high of $75.50 and investors in its common shares to suffer an equally stunning 83.9% decline from their Loss Period high of €86.50.

## VIII.  **DEFENDANTS' SCIENTER**

247. Throughout the Loss Period, Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Vivendi's financial condition, as alleged herein.  Many of the misstatements and omissions were the result of intentional deception and intentional violations of GAAP by these Defendants, for the purposes of boosting Vivendi's ordinary share and ADS prices.

248. As set forth elsewhere herein in detail, Messier and Hannezo—by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's materially misleading statements, financial statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Vivendi—were active and culpable participants in the fraudulent scheme alleged herein.  These Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the market and to Plaintiff.

249. Vivendi is charged with the knowledge possessed by its senior officers, including Messier and Hannezo.

250. Messier's and Hannezo's intentional misconduct included, *inter alia*, authoring and enforcing improper accounting practices and demanding that Vivendi's employees misapply GAAP in order to mask the true liquidity and cash flow situation that Vivendi was suffering.

251. During the Loss Period, Messier and Hannezo signed Vivendi's Forms 20-F, Annual Reports and/or Forms 6-K with knowledge that they falsely represented Vivendi's financial results, or with reckless disregard for their truth or falsity.

252. By mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had it happened, would have nearly eliminated Vivendi's cash and would have deleteriously impacted the Company's ability to borrow more funds from its credit facilities for further acquisitions. In fact, it was that near downgrade that gave Hannezo the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to implore Messier that "all of this not end in shame." *See* ¶¶ 7, 115, *supra*. Nevertheless, Messier chose to not mention the narrowly-averted credit rating downgrade when urging Vivendi's Board of Directors to approve the $10 billion acquisition of USA Network's television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia*, its cash and liquidity situation.

253. Further, as alleged above (¶¶ 85-87), Hannezo knew from a memo dated January 29, 2001, which was prepared shortly after Vivendi acquired Canal+, that the football marketing rights that originally had been believed to be an asset of Canal+ actually belonged to the football league. Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi

took no impairment charge in fiscal 2001, resulting in Vivendi overstating the value of its subsidiary.

254. Additional evidence of Defendants' scienter is the fact that, even though Vivendi claimed in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a €1 per share dividend, Vivendi had had to borrow against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends. Similarly, despite stating in Vivendi's June 26, 2002 press release that it had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

255. The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct. As set forth above, the revelation of Vivendi's truly dismal liquidity situation – including a €19 billion debt burden – caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crumble, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi sorely needed fresh credit. Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure. This cash and liquidity crisis did not happen overnight but, rather, was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the attendant prestige, power and money that would inure to them as the world's leading media and entertainment group. The

extent of the crippling debt load, that Vivendi only first started to publicly admit it was bearing in July 2002, directly belied the financial picture that Defendants presented to the securities markets during the Loss Period.

256. Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's viability going forward was threatened absent a "fire sale of its assets," new management rapidly downsized the Company, sold off major assets and restructured it. *See* ¶ 236, *supra*. Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' hunger for a global empire that they built by means of a fraudulent scheme that misled investors about Vivendi's financial condition, cash and cash flow positions, and liquidity situation. *See* Sections V.B and V.C, *supra*.

257. In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse. In addition, as reported by the Associated Press on December 12, 2002, Hannezo admitted that "2001 was marked by a series of errors, including underestimating the debt problem." Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi invariably would have gone bankrupt "within 10 days."

258. The criminal, civil and regulatory authorities in the United States and in France (including the SEC, the United States Attorney's Office, public prosecutors in Paris and the COB) that investigated and/or commenced proceedings against Defendants all focused on the same question: whether Vivendi, Messier, Hannezo and other Vivendi executives misled investors with overly rosy assessments of the Company's financial health. As a result of its investigation, the SEC found that Vivendi, Messier and Hannezo violated the federal securities

laws, including Section 10(b) of the Exchange Act. The COB concluded that Vivendi had committed irregularities in its financial disclosures and fined Vivendi and Messier €1 million each for making misleading financial disclosures between 2000 and 2002.

259. Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of achieving concrete benefits from their fraudulent conduct. Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its enterprise. In total, Vivendi spent over $75 billion in pursuit of Messier's ambition to create the world's number-one entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities as consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's ordinary shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above. In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further acquisitions depended on Defendants' fraudulent scheme. Vivendi's global reach could not have been achieved *without* Defendants' fraudulent inflation of Vivendi's share price.

260. Messier had an even greater motive for inflating the appearance of Vivendi's financial performance from which he derived concrete benefit by virtue of his fraudulent conduct: his bonus was pegged to Vivendi achieving specific earnings targets. Messier's compensation included a base salary, plus lucrative bonuses based on earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at below market rate. As reported in Vivendi's Form 20-F for fiscal year ended December 31, 2001, Messier received 835,000 stock options and earned $4.8 million in compensation. Of that amount, more than $3 million – two-and-a-half times his salary –

** 

comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%. Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus. Hannezo likewise received extremely lucrative compensation and remuneration that was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

261. As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Loss Period. Hannezo signed many of the Company's SEC filings and Annual Reports, as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity, which they took, to commit fraud.

262. Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

263. Messier's and Hannezo's scienter is further evidenced by their clandestine insider trading during the Loss Period. According to an article in The Wall Street Journal dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately need cash. That transaction sent Vivendi's ordinary share and ADS price crashing. Specifically, as reported by The Wall Street Journal, on or about December 28, 2001, just days after writing the "death seat" memo and before the stock sale transaction, Hannezo exercised stock options that earned him a profit of €1.3 million or $1.4 million. An April 11, 2003 article in The Wall Street Journal reported that Vivendi acknowledged that Messier also sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department, also exercised stock options at or around the same time. Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury stock in a €3.3 billion deal. Given their top roles at the Company, Messier and Hannezo and these other executives knew or were in a position to know about that transaction. The market reaction to the sale caused the Company's share price to tumble, but not before Messier, Hannezo and their cronies had the chance to exercise stock options at a profit. It was not until April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares, worth at least €15 million.

## IX. LOSS CAUSATION

264. At all times relevant hereto, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Plaintiff. As described herein, during the Loss Period, Defendants made or caused to be made a series of

materially false or misleading statements about Vivendi's business, prospects, operations and financial condition. These material misstatements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all times relevant hereto. Defendants' materially false and misleading statements during the Loss Period resulted in Plaintiff purchasing or otherwise acquiring the Company's securities at artificially inflated prices. But for Defendants' misrepresentations and fraudulent acts, Plaintiff would not have purchased Vivendi securities, or would not have purchased them at the artificially inflated prices at which they were trading during the Loss Period. As the truth about Vivendi's actual business, prospects, operations and financial condition was revealed, the inflation caused by these misrepresentations was eliminated from the price of Vivendi's securities, thus causing damages to Plaintiff.

265. As stated above, Vivendi's stock price began to drop starting on May 3, 2002. On that date, Moody's lowered the Company's long-term debt rating to just one notch above "junk" status, citing concerns about the Company's debt load. Despite Defendants' attempt to reassure the market that Moody's was wrong, in response to Moody's rating downgrade, on May 3, 2002, the Company's ADSs dropped $1.60 down from its close of $30.67 on May 2, 2002 to a close of $29.07 on May 3, 2002. The Company's common shares suffered similar declines, dropping from €33.77 on May 2, 2002 to €31.52 on May 3, 2002.

266. Vivendi's stock continued to plunge as the market learned of the potentially devastating effects subsequent credit downgrades could have on the Company. Notably, following May 6, 2002 press accounts revealing that Vivendi could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip

- 108 -

any further, the Company's ADSs dropped another $0.81 to a closing price on May 6, 2002 of

$28.26, while its common shares dropped another €0.52 to a closing price on May 6, 2002 of

€31.

267. On July 2, 2002, Vivendi's debt was downgraded for a second time. This

announcement caused Vivendi's ADSs to plummet nearly 21%, falling from a closing price on

July 1, 2002 of $22.45 to a closing price on July 2, 2002 of $17.76, while its common shares fell

more than 25%, from its closing price on July 1, 2002 of €23.90 to a closing price on July 2,

2002 of €17.80. The Company's shares plunged so fast that the Paris Bourse repeatedly

suspended trading in Vivendi's common shares.

268. The following day, Vivendi finally disclosed to the public that the Company was

facing a "short-term liquidity issue" and ousted Messier. Vivendi disclosed that it would be

required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit

lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash

shortfall of €2.7 billion by the end of 2002—an amount they feared could expand to €5.5 billion

by the middle of 2003 if the Company failed quickly to secure new multibillion euro lines of

credit. These announcements caused the Company's ADSs and common shares to fall even

further, dropping nearly another 12% from its July 2, 2002 close of $17.76 to a July 3, 2002

closing price of $15.66 and nearly another 22% from its July 2, 2002 close of €17.80 to a July 3,

2002 close of €13.90, respectively. In total, the Company's ADSs and common shares fell a

stunning 30% and 41.8%, respectively, in the two days following the second credit rating

downgrade.

269. On July 10, 2002, The Wall Street Journal reported that the COB had raided

Viviendi's Paris headquarters as part of a formal investigation into the Company's financial

disclosures going back to 2001. Notably, the French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

270. Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come. On August 14, 2002, Vivendi announced that it had suffered €12 billion net loss for the first half of 2002 and that it would take a further €11 billion goodwill write down for depreciated assets. Following this announcement, Standard & Poor's dropped Vivendi's debt to junk status. Vivendi's ADSs and common shares cratered, dropping a stunning 23.9% and 25.2%, respectively—falling from $15.33 to $11.66 and from €15.90 to €11.89, respectively—in a single day.

271. Between July 2, 2002 and August 14, 2002, Vivendi lost a stunning €6.4 billion in market capitalization.

272. All told, Messier's more than $75 billion acquisition spree caused investors in the Company's ADSs to suffer a staggering 85% decline from their Loss Period high of $75.50 and investors in its common shares to suffer an equally stunning 83.9% decline from their Loss Period high of €86.50.

## X.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

273. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the allegedly false statements pleaded herein as many of the statements were of historical facts or existing conditions and not identified as forward-looking statements. To the extent certain statements pleaded herein were forward looking, they were not accompanied by specifically tailored, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the forward looking statement.

To the extent that the statutory safe harbor would otherwise apply to any statement pleaded, Defendants are liable for those false forward looking statements because at the time each of those statements was made the speaker actually knew the statement was false.

## XI.  PRESUMPTION OF RELIANCE

274. In connection with its claims under Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and the common law, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine as the securities purchased by Plaintiff traded in an open and efficient market.

275. As set forth above, Defendants made material misrepresentations or failed to disclose material facts.  These misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities.  Plaintiff purchased the Company's securities between the time that Defendants misrepresented material facts and the time the true facts were disclosed.

276. The Company's ordinary shares are listed and trade on the Paris Bourse and its ADSs were listed and traded on the NYSE during the Loss Period, both of which are highly efficient markets.

277. As regulated issuers, Vivendi filed periodic reports with the SEC and other regulators.  In addition, Vivendi was followed by securities analysts who wrote reports that were disseminated to the public.   Further, Vivendi issued press releases that were carried by national and international newswires and thus were publicly available and entered the public marketplace.

278. As a result, the market for Vivendi securities promptly digested current information from all publicly-available sources and reflected such information in the price of Vivendi's securities.  Under these circumstances, all purchasers of Vivendi's securities suffered similar

injury through their purchases of the Company's securities at artificially inflated prices and a
presumption of reliance applies.

## XII.  TOLLING OF THE STATUTE OF LIMITATIONS

279. Plaintiff did not know, and could not reasonably have discovered before—at the
earliest—July 2, 2002 that Vivendi's financial statements and Defendants' other public
statements regarding the Company's financial condition were materially false and misleading.
On that date, Vivendi's debt, which had been downgraded to one notch above "junk" status on
May 3, 2002, was downgraded for a second time, sparking near-panic selling in Paris.  This
selling frenzy crushed Vivendi's common share prices, causing the stock to drop 25% to a new
15-year low of €17.80.  Following his July 3, 2002 ouster, Messier continued to deny any
wrongdoing, steadfastly maintaining that the Company's financial results were all "true, genuine
and complete."

280. These attempts to reassure the market, however, would ultimately prove futile.  On
August 14, 2002, Vivendi was at long last forced to reveal its financial woes, announcing that it
had suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10
billion in assets to reduce its debt.  Jean-Marie Fortou, Messier's successor, flatly admitted, "We
are facing a liquidity problem."

281. Prior to—at the earliest—July 2, 2002, the statutes of limitations on Plaintiff's
claims were tolled by Defendants' active and continuing concealment of the falsity of their
statements.  Further, the statutes of limitations on Plaintiff's claims were again tolled beginning
on July 18, 2002, due to the filing of a securities class action complaint on that date in
*Rosenbaum Partners, L.P. v. Vivendi Universal,* No. 02 Civ. 5571 (now pending as the Securities
Class Action).  Plaintiff was a member of the putative class in that action, which asserts claims
against Vivendi and Messier pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the

Exchange Act. Those claims arise out of the same facts and circumstances as the claims in this

Complaint.

282. By Order dated May 21, 2007, the Court ruled on the plaintiffs' motion for class

certification in the Securities Class Action. The Court certified a class of all purchases of

Vivendi securities located in United States, England, France and The Netherlands. Accordingly,

the statutes of limitations on Plaintiff's claims remained tolled between July 18, 2002 and May

21, 2007.

283. All of Plaintiff's claims have been brought within the applicable statutes of

limitations, after giving effect to tolling and the relation-back doctrine.

## XIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and
### Subsections (a), (b) and (c) of Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

284. Plaintiff repeats and realleges each of the allegations set forth above as if fully set

forth herein.

285. As described above, Defendants made and disseminated numerous false and

misleading statements that were directly attributable to them. Defendants were provided with or

had unlimited access to copies of the Company's financial statements, internal reports, press

releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to, but did not, prevent the issuance

of the statements or cause the statements to be corrected.

286. As described above, Defendants carried out a fraudulent scheme and course of

conduct and/or business that was intended to and did as alleged herein: (i) deceive Plaintiff;

(ii) artificially inflate and maintain the market price of Vivendi securities; and (iii) cause Plaintiff

to purchase Vivendi securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein, which operated as fraud and deceit upon Plaintiff as a purchaser of Vivendi securities.

287. As alleged above, Defendants acted with scienter in that they knew or were reckless in not knowing that Vivendi's press releases, public statements reported in news articles, investor conferences and analyst reports, Annual Reports, Forms 20-F, Forms 6-K, Registration Statement and documents filed with the COB during the Loss Period referenced above, as well as Defendants' own public statements set forth herein, were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to the investing public, including Plaintiff; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of federal securities laws.

288. As a direct and proximate result of Defendants' wrongful conduct in violation of Section 10(b) and Rule 10b-5, the market prices of Vivendi common shares and ADSs purchased by Plaintiff were artificially inflated. In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market, Plaintiff purchased Vivendi securities at artificially inflated prices.

289. Had Plaintiff known the truth concerning the misrepresented and omitted facts described above, it either would not have purchased or otherwise acquired its Vivendi securities at all, or would have done so only at substantially lower prices.

290. Plaintiff was substantially damaged as a result of its purchases of Vivendi securities at artificially inflated prices and the subsequent decline in price of those securities when the fraud was disclosed.

## SECOND CLAIM FOR RELIEF
### Violation of Section 18 of the Exchange Act
### (Against All Defendants)

291. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiff does not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 41, 43, 44, 45, 54, 67, 73, 125, 247-263, and 285-290. For the purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

292. This claim is asserted against all Defendants for violation of Section 18 of the Exchange Act.

293. As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Vivendi, including the Company's filings on Form 20-F during the Loss Period.

294. In connection with the purchase of the Company's shares, Plaintiff and/or its agents specifically read and relied upon the Company's SEC filings, including the Company's filings on Form 20-F during the Loss Period.

295. Specifically, Plaintiff read and relied on the Company's financial statements in those filings and other statements regarding Vivendi's business operation and financial results, including its debt load and cash flow. Plaintiff further relied on the Company's statements in those filings as being materially complete and as not omitting material information, including information about the Company's financial condition. Plaintiff and/or its agents relied on these SEC filings not knowing that they were false and misleading

296. The reliance by Plaintiff and/or its agents was reasonable.

297. When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiff was significantly damaged by the resulting drop in the value of the Company's stock

298. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damage in connection with its purchases of the Company's stock.

299. By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

### THIRD CLAIM FOR RELIEF
#### Violation of Section 20(a) of the Exchange Act
#### (Against Defendants Messier and Hannezo)

300. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

301. Messier and Hannezo, by reason of their executive positions; their direct involvement in the day-to-day operations of Vivendi, including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Vivendi's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent accounting practices that caused the Company's financial statements to be false and misleading, were control persons of Vivendi. As such, Messier and Hannezo had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

302. As set forth above, Vivendi participated in a fraudulent scheme and course of business or conduct, and issued false and misleading statements as a primary violator of Section

10(b) of the Exchange Act and subsections (a), (b), and (c) of Rule 10b-5 promulgated thereunder. Additionally, Vivendi violated Section 18 of the Exchange Act by filing materially false statements with the SEC, as set forth above. By virtue of their positions as control persons of Vivendi and their culpable participation in the Company's fraud, Messier and Hannezo are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Vivendi for its primary violations of Sections 10(b) and 18 and Rule 10b-5.

303. As a direct and proximate result of Vivendi's primary violations of the Exchange Act, for which Messier and Hannezo are liable pursuant to Section 20(a), Plaintiff suffered substantial damages in connection with its purchases of the Company's securities during the Loss Period.

### FOURTH CLAIM FOR RELIEF
### Violations of Section 11 of the Securities Act
### (Against All Defendants)

304. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiff does not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 41, 43, 44, 45, 54, 67, 73, 125, 247-263, 285-290 and 301-303. For the purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

305. This claim is brought pursuant to Section 11 of the Securities Act against Defendants.

306. Vivendi issued common shares pursuant to the registration statement contained within the Form F-4 for the Merger (hereinafter, the "Registration Statement"). All purchases of Vivendi common shares are traceable to the Registration Statement.

- 117 -

307. The Registration Statement contained untrue statements of material fact including, but not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the true cash and liquidity situation that existed at Vivendi at the time the Registration Statement was issued and the GAAP violations described herein. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

308. Vivendi issued stock pursuant to the Registration Statement—which Messier and Hannezo signed—and, accordingly, Defendants are strictly liable for the untrue statements of material fact and omissions to state material facts therein.

309. Defendants owed Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

310. As alleged in detail herein, Defendants did not make a reasonable investigation of the statements contained in the Registration Statement, and did not possess reasonable grounds to believe that the Registration Statement did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements therein not misleading.

311. Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untrue statements of material fact or omissions of material fact in the Registration Statement when it purchased or acquired Vivendi's ordinary shares.

- 118 -

312. By reason of the foregoing, Defendants are liable to Plaintiff for violations of Section 11 of the Securities Act.

### FIFTH CLAIM FOR RELIEF
**Violations of Section 12(a)(2) of the Securities Act
(Against All Defendants)**

313. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiff does not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 41, 43, 44, 45, 54, 67, 73, 125, 247-263, 285-290 and 301-303. For the purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

314. This claim is brought pursuant to Section 12(a)(2) of the Securities Act.

315. Defendants offered to sell, and did sell, in a public offering Vivendi's ordinary shares by means of the merger prospectus contained within the Form F-4 for the Merger (hereinafter, the "Merger Prospectus"). As alleged in detail herein, the Merger Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading. The untrue statements of material fact in the Merger Prospectus included, but were not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the Merger Prospectus omitted to state material facts necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading, including the Company's cash and liquidity situation at the time of the Merger. The facts misstated and omitted would have been material to a reasonable person reviewing the Merger Prospectus.

- 119 -

316. Defendants owed to the purchasers of Vivendi shares, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Merger Prospectus to ensure that it was true and that there was no omission to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

317. As alleged in detail herein, Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds to believe that the Merger Prospectus did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

318. Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Merger Prospectus at the time it acquired Vivendi shares.

319. By reason of the foregoing, Defendants are liable to Plaintiff—who has been damaged thereby—for violations of Section 12(a)(2) of the Securities Act.

320. Plaintiff hereby tenders its shares of Vivendi securities to Defendants and seeks rescission of its purchases to the extent that it continues to own such securities.

## SIXTH CLAIM FOR RELIEF
### Violations of Section 15 of the Securities Act
### (Against Messier and Hannezo)

321. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  In particular, Plaintiff does not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 41, 43, 44, 45, 54, 67, 73, 125, 247-263,

285-290 and 301-303. For the purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

322. This claim is brought pursuant to Section 15 of the Securities Act against Messier and Hannezo on behalf of Plaintiff for damages it suffered in connection with the its purchase or acquisition of Vivendi ordinary shares that were issued in or traceable to the Merger.

323. As alleged in detail herein, Vivendi violated Section 11 of the Securities Act with respect to the Merger by an issuing a Registration Statement that included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

324. As alleged in detail herein, Vivendi violated Section 12(a)(2) of the Securities Act by soliciting Plaintiff's purchases of Vivendi's common shares by means of the Merger Prospectus, which included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. In soliciting these purchases, Vivendi was motivated by its own financial interests. Vivendi failed to exercise reasonable care regarding the accuracy and completeness of the Merger Prospectus. The facts misstated and omitted would have been material to a reasonable person reviewing the Merger Prospectus.

325. Vivendi had a duty to disseminate accurate and truthful information with respect to Vivendi's financial condition and results of operations.

326. Messier and Hannezo were control persons of Vivendi when the Registration Statement was filed and became effective and the Merger Prospectus was disseminated (among other reasons alleged herein) due to their positions, respectively, as CEO and Chairman, and

- 121 -

CFO of Vivendi; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Registration Statement and Merger Prospectus. Because of their positions of control and authority over Vivendi, Messier and Hannezo were able to, and did, control the contents of the Registration Statement and the Merger Prospectus.

327. By virtue of the foregoing, Messier and Hannezo both had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content of its financial statements and of the Registration Statement and the Merger Prospectus.

328. Plaintiff purchased Vivendi ordinary shares issued in, or traceable to, the Merger and was damaged thereby. The Merger was conducted pursuant to the Registration Statement and the Merger Prospectus.

329. Messier and Hannezo acted negligently and without reasonable care regarding the accuracy of the information contained in the Registration Statement and the Merger Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

330. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the Registration Statement and the Merger Prospectus.

331. Plaintiff has sustained damages as a result of the inaccurate statements and omissions in the Registration Statement and the Merger Prospectus, for which it is entitled to compensation.

## SEVENTH CLAIM FOR RELIEF
### Common Law Fraud
### (Against All Defendants)

332. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

333. Plaintiff asserts this cause of action based on common law principles of fraud.

334. As alleged herein, each Defendant made material misrepresentations, or failed to disclose material facts, to Plaintiff regarding Vivendi's financial condition.

335. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Vivendi's true financial condition and future business prospects from Plaintiff and supporting the artificially inflated price of the Company's securities. As demonstrated by Defendants' misstatements of Vivendi's cash and liquidity positions during the Loss Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

336. The aforesaid misrepresentations and omissions were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiff when making investment decisions.

337. The aforesaid misrepresentations and omissions constitute fraud and deceit under applicable law.

338. Plaintiff reasonably relied upon Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities. Plaintiff read the Company's press

releases, filings on Forms 20-F, and filings of Forms 6-K, including the financial statements contained therein. Plaintiff relied on those statements as being materially complete, and as not omitting material information. In particular, Plaintiff read and relied on the line items in the Company's financial statements for cash, liquidity and earnings per share. Plaintiff's decisions to purchase and hold Vivendi ADSs and ordinary shares were based, in significant part, on Plaintiff's analysis of these financial metrics as set forth in the Company's financial statements.

339. At the time Vivendi's securities were purchased and held by Plaintiff, Plaintiff did not know of the false and/or misleading statements and omissions. If Plaintiff had known the true facts, it either would not have purchased Vivendi's securities or would have done so only at substantially lower prices.

340. As a direct and proximate result of Defendants' fraud and deceit, Plaintiff suffered damages in connection with its purchases and holding of Vivendi's securities.

### EIGHTH CLAIM FOR RELIEF
### Common Law Negligent Misrepresentation
### (Against All Defendants)

341. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiff does not repeat and reallege herein the allegations of paragraphs 3, 4, 6, 7, 9, 13, 23, 33, 35, 41, 43, 44, 45, 54, 67, 73, 125, 247-263, 285-290, 301-303 and 334-340. For the purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

342. This claim is brought by Plaintiff against Defendants under common law principles of negligence.

- 124 -

343. Defendants made materially false and misleading statements, as set forth above, regarding, *inter alia*, the financial condition and the accounting policies and practices of the Company.

344. Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements and accounting policies and practices during the Loss Period were materially false and misleading.

345. Defendants owed Plaintiff a duty of reasonable care in connection with the provision of information concerning the financial condition of Defendant Vivendi. Defendants Vivendi, Messier and Hannezo breached this duty by including in Vivendi's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

346. Plaintiff, as an investor, was entitled to rely upon, and was justified in relying upon, the representations made by Defendants, set forth above, regarding the Company's financial statements, accounting policies and practices, and compliance with GAAP. Plaintiff relied upon the superior knowledge and expertise of Defendants and justifiably relied to its detriment on Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities.

347. As alleged above, Defendants materially misrepresented Vivendi's financial results and its compliance with GAAP throughout the Loss Period.

348. Plaintiff had no knowledge of the false and misleading nature of Defendants' statements when purchasing and refraining from selling Vivendi's securities, and believed them to be true. Had Plaintiff been aware of the true facts, it would either not have purchased Vivendi's securities, or would not have purchased the securities at inflated prices.

349. As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's securities was artificially inflated and Plaintiff sustained damages in connection with its purchases and holding of Vivendi's securities when the price of the securities declined.

350. Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.

### NINTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against All Defendants)**

351. Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

352. Defendants' scheme to hide Vivendi's liquidity crisis and artificially inflate its share prices through the use of improper accounting methods unjustly enriched Defendants, at Plaintiff's expense, by artificially inflating the price Plaintiff paid for Vivendi securities during the Loss Period.

353. Defendants' retention of the unjustly acquired amounts violates the fundamental principles of justice, equity, and good conscience.

354. Accordingly, Defendants should be ordered to return any funds obtained at Plaintiff's expense as a result of their scheme.

### XIV.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on its behalf as follows:

1.      Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

2.      Awarding Plaintiffs the right to rescind its Vivendi securities to the extent it continues to hold such securities;

3.      Awarding Plaintiff on the common law fraud claim asserted above an amount of punitive or exemplary damages in an appropriate amount to accomplish the purposes and aims of such damages, in an amount to be determined at trial under appropriate procedures against Defendants;

4.      Awarding Plaintiff the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

5.      Awarding Plaintiff such other and further relief as this Court may deem just and proper.

## XV.  **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.


Dated: New York, NY
      August 17, 2007

**GRANT & EISENHOFER P.A.**

By: _____
    Stuart M. Grant (SG-8157)
    James J. Sabella (JS-5454)
    Diane Zilka (DZ-9452)
    Christine M. Mackintosh
485 Lexington Avenue
29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:   (646) 722-8501

*Attorneys for Plaintiff*